Nicholas M. Aiello and Evelyn Aiello, Plaintiffs and Counter-Defendants, v. Casimir L. Grace and Jean R. Grace, Defendants and Counter-Claimants, Appellants, Thomas J. Kilroy and Edwin J. Doody, Counter-Defendants, Lilyan Kilroy, Administrator of the Estate of Thomas J. Kilroy, Deceased, Counter-Defendant, Appellee.

Gen. No. 51,637.

First District, Second Division.

September 24, 1968.

Appeal from the Circuit Court of Cook County; the Hon. DANIEL A. COVELLI, Judge, presiding. Judgment affirmed.

Raymond I. Suekoff, of Chicago (Stuart C. Katz and Allen Kanter, of counsel), for appellants.

■■■■■■

Charles Justin Little and Harold L. Craven, of Chicago, for appellees.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

This was an action for possession and rent brought by Nicholas and Evelyn Aiello, the contract sellers of a residence in Chicago, against Casimir and Jean Grace, the contract purchasers. The Graces filed a counterclaim against the Aiellos, also sought damages against Edwin Doody, the real estate broker who negotiated the transaction and who drew the contract in question, and against Thomas Kilroy, a licensed attorney and the escrowee nominated in the contract. The Aiellos and Kilroy answered the counterclaim; Doody was served but defaulted.

The matter was referred to a Master in Chancery who, after hearing extensive evidence, found for the Aiellos and against the Graces on both the original complaint and the counterclaim; for the Graces and against Doody on the counterclaim; and for Kilroy and against the Graces on the counterclaim. The Graces and Kilroy filed objections to the Master's report, which were allowed to stand as exceptions to the report. The trial court thereafter overruled the exceptions and entered a decree in conformity with the findings and recommendations of the Master. This appeal is taken from that part of the decree finding the issues raised by the counterclaim and Kilroy's answer thereto in favor of Kilroy and against the Graces.

Kilroy and Doody had known each other for several years prior to 1961, Kilroy having represented Doody in a criminal matter during that period. It appears that Doody had several personal judgments against him and that his bank account was constantly being garnisheed, as a result of which he was hampered in the operation of his real estate broker's business. Prior to August 24,

446

1961, Doody requested Kilroy to open a checking account in Kilroy's name for Doody's use; Kilroy opened such an account, hereinafter referred to as special account #1. Doody made deposits to the account from time to time and when he desired a disbursement from the account, he would inform Kilroy as to the name of the payee and the amount of the check to be issued, whereupon Kilroy would draw the desired check. Kilroy testified that although he was aware that deposits were being made to the account from time to time, he did not know the precise amounts of those deposits at any given time nor what the deposits represented. During the period the special account was open, the total amount issued by Kilroy for the accommodation of Doody was slightly under $28,000.

Some time after special account #1 was opened, Kilroy's accountant informed him that difficulties had arisen with respect to that account; the accountant advised Kilroy to close that account and to open a new account with the balance withdrawn from special account #1. In the latter part of September 1961, Kilroy closed special account #1 and opened special account #2, with the balance therefrom, at the same bank, the new account again to be employed for the benefit of Doody. There was further evidence that during this entire period Kilroy maintained a personal checking account at the same bank in which Doody occasionally inadvertently made deposits; Kilroy testified that due to this mistake he wrote several checks for Doody from the personal account during August and September 1961. There was evidence that Kilroy's wife reconciled the personal account, while his accountant reconciled the special account. It also appears that Kilroy's name, as attorney, appeared on the door to Doody's office; Kilroy stated that it was placed there without his consent or knowledge and that he requested Doody to remove it, and his testimony is uncontradicted

that he received no law practice from Doody's real estate operation.

Prior to August 24, 1961, the Aiellos retained Doody as real estate broker to sell their residence in Chicago. On August 24, Doody, acting as Aiellos' broker, contacted the Graces with regard to the purchase of the Aiello residence for $28,000 and secured their signatures on the contract. Simultaneously with the signing of the contract, the Graces drew a check for the $2,000 earnest money deposit required by the contract, payable to Kilroy, the escrowee named in the contract, and delivered the check to Doody. Later that day the Graces received a telephone call from Doody to the effect that the Aiellos required an additional deposit of $13,000 as earnest money to secure the deal and that said additional amount would have to be deposited with Kilroy. The following day the Graces delivered to Doody another check payable to Kilroy in the amount of $13,000. On September 21, 1961, pursuant to a later request by Doody, the Graces delivered to him two additional checks in the amounts of $4,874.18 and $4,700, payable to Kilroy, and the added sum of $300 in cash.

The Aiellos testified that they did not authorize Doody to obtain any funds from the Graces other than the $2,000 earnest money deposit as provided in the contract. It appears that the contract signed by both the Aiellos and the Graces did not contain a provision with regard to an additional earnest money deposit of $13,000, whereas the contract received in evidence, being apparently the original contract and bearing the signature of the Aiellos and the Graces, contains such a clause. It also appears that all four checks issued by the Graces which were made payable to Kilroy and delivered to Doody had been endorsed and cashed, three of which were deposited into special account #1 and the fourth de-

posited in an account standing in the name of Doody's wife.

On Friday, October 6, 1961, the Aiellos and the Graces met at the lending institution where the Graces had previously arranged to secure the balance of the purchase price for the building, in anticipation of closing the deal. Doody appeared and informed those present that Kilroy was out of town and that the payout would have to be postponed. The following day the Aiellos surrendered possession of the premises to the Graces.

Doody subsequently delivered check #110, drawn on special account #2 and bearing Kilroy's signature as drawer, to the lending institution in the amount of $20,486.59, apparently representing the amount necessary to finalize the deal. Payment on the check was thereafter stopped by Doody and the account was later frozen by Kilroy. The lending institution returned all the papers to the respective parties and the closing did not take place. Although Doody returned several thousand dollars to the Graces, the full amount paid to him was not returned; Doody was indicted and pleaded guilty to the crime of obtaining money by means of a confidence game, for which he was sentenced to the penitentiary.

According to Kilroy's testimony, Doody telephoned him on Friday, October 6 or 13, 1961, and requested Kilroy to sign two checks in blank, promising that he would see Kilroy in a short while with an explanation. Kilroy signed two blank checks, among which was check #110, and when Doody later failed to appear, Kilroy left town, leaving the signed checks behind. It was stipulated between the parties that if called as a witness, Kilroy's wife would testify that Doody came to the Kilroy residence on the first or second Friday in October and by ruse, obtained the special account #2 checkbook from Mrs. Kilroy, without knowldege on her part that it contained the two signed blank checks. Check #110 was

later completed by Doody and was presented to the lending institution by him. Kilroy testified that he did not learn of check #110 until several days thereafter, when he froze the account.

The Master found, inter alia, that Doody added language to the contract signed by the Graces and the Aiellos, requiring the Graces to deposit the additional sum of $13,000 with Kilroy; that the Graces gave Doody $15,000 due to the altered contract, and the additional sum of $9,874.18 because they trusted him; that Kilroy had no interest in Doody's real estate brokerage business; that Kilroy knew only that Doody was engaged in the real estate brokerage business and knew that part of the funds in the accommodation accounts was for use in that business; that, although named in the Aiello-Grace contract as escrowee, Kilroy never agreed to act in such capacity; that Kilroy's signatures on all four checks issued by the Graces, payable to Kilroy and delivered to Doody, were forgeries; that check #110 presented to the lending institution was obtained by Doody by trickery from Kilroy's wife and was completed by Doody and presented by him to the lending institution without Kilroy's knowledge or consent; and that the Graces parted with no funds nor in any way altered their position in reliance upon the issuance of check #110.

Appellants do not question the findings of fact made by the trial court, but it is their position that Kilroy must be held accountable for the loss which they suffered inasmuch as Kilroy innocently afforded Doody the opportunity to convert the monies paid by them to Doody through the creation of the special account for Doody's accommodation. We disagree.

██ There can be no argument with the well established principle advanced by appellants that where one of two innocent parties furnishes a third-party malefactor

with the means of perpetrating a wrong, as between those two parties he is to be held accountable for, and must bear the loss occasioned by the wrong although he himself was not a party to the wrong. Westlake Finance Co. v. Oak Park Motors, Inc., 19 Ill2d 66, 72, 166 NE2d 23. This principle, however, has no application to the situation at bar.

██ The creation by Kilroy of the special account for the accommodation of Doody had only incidental bearing on Doody's obtaining control of and converting to his own use the deposit monies advanced by the Graces. The Aiellos testified, and the Master found, that Doody, as real estate broker for the Aiellos, was only authorized to receive the $2,000 earnest money deposit from the Graces as provided in the contract. However, not only did Doody improperly deal with the $2,000 earnest money check issued to Kilroy by the Graces, as evidenced by his forgery of Kilroy's endorsement thereon, but he acted beyond the scope of his broker agency by demanding and receiving from the Graces the three additional checks, the endorsements of Kilroy on which he again forged, as well as the additional $300 in cash. Three of the checks were deposited into the special account, and one of them was deposited into an account standing in the name of Doody's wife, all within two days of their delivery to Doody by the Graces. What became of the $300 in cash which Doody received from the Graces does not appear of record. As is evidenced by the deposit of the check into the account standing in the name of Doody's wife, it cannot be said that "but for Kilroy's creation of the special account the conversion by Doody would not have occurred." Doody acted in his capacity as real estate broker and "confidant" and in this manner improperly obtained the Graces' money. That the checks were made payable to Kilroy and that Kilroy was nominated in the contract as escrowee does

451

not alter this conclusion, inasmuch as the evidence shows, as the Master found, that Kilroy's signatures on the checks were forged and that Kilroy never consented to act as escrowee under the contract. Any checks drawn by Kilroy upon either of the special accounts at the behest of Doody were drawn by him as agent for Doody; any improprieties engaged in by Doody alone, the principal, with respect to the funds on deposit in the special accounts cannot be charged against Kilroy, the agent. See generally 3 Am Jur2d, Agency, §§ 301–304.

The evidence further shows that the Graces in no way relied upon Kilroy or the special accounts when they entrusted their funds to Doody. Not until the counterclaim herein was filed did the Graces ever look to Kilroy for reimbursement for their loss. On the contrary, Doody was entrusted with the funds by the Graces, and it was Doody to whom the Graces first looked for reimbursement. It is apparent that the creation by Kilroy of the special accounts for the accommodation of Doody was not the prime cause of the Graces' loss; rather, it was their entrusting to Doody almost $23,000 over and above the amount called for by the original contract, without any question on their part and without their having sought legal or other professional advice beforehand, and although the purchase price of the building was $28,000 whereas the Graces had been approved for a mortgage of $8,500 in late August.

The cases cited by appellants in this regard involved the question of which of two otherwise innocent parties must bear the loss occasioned by the wrong committed by a third-party malefactor where one of those two innocent parties provided the malefactor with the power by which the wrong was perpetrated. See e. g., Western Union Cold Storage Co. v. Bankers' Nat. Bank of Chicago, 176 Ill 260, 52 NE 30; Otis v. Gardner, 105 Ill 436; Westlake Finance Co. v. Oak Park Motors, Inc.,

19 Ill2d 66, 166 NE2d 23. In the case at bar, on the other hand, there was no evidence that Kilroy was responsible for Doody's obtaining the Graces' funds and converting them to his own use. On the contrary, the evidence clearly shows that the Graces themselves gave Doody the power to perpetrate his criminal acts by placing their trust in him and delivering to him cash and checks in substantial amounts without question.

Appellants further maintain that, as a practicing attorney, Kilroy is presumed to know the impropriety of lending the use of his name to a person, enabling the latter to gain secret custody of trust funds. However, whatever may have been irregular about Kilroy's creation of the special accounts, insofar as it was intended to defeat the rights of Doody's creditors, it had no bearing upon the independent actions of Doody in gaining access to the Graces' funds and employing them to his own use. Appellants state that because he was a practicing attorney, Kilroy must be "presumed to have had particular knowledge of the probable results of his misconduct," yet it is difficult to perceive the relationship between the purpose of the special accounts, namely, to place Doody's funds out of the reach of his creditors, and the conversion of the Graces' funds to Doody's own use, of which Kilroy was supposedly to have been aware when he opened the accounts. The further fact that Kilroy represented Doody in a criminal matter in the past does not, of itself, suggest that Kilroy should have been aware that Doody would attempt to use the special accounts to convert his clients' funds to his own use.

The cases cited by appellants in support of their position that Kilroy should be held accountable because he should be "presumed to have had particular knowledge" that his conduct would provide Doody with the opportunity to convert his clients' money to his own use are not in point, inasmuch as they deal with situations where

the party held liable for the loss occasioned by the malefactor had direct knowledge of the existence of the situation and yet chose to ignore it. See Aurora Nat. Bank of Aurora v. Ed Fanning Chevrolet, Inc., 85 Ill App2d 394, 229 NE2d 2; Westlake Finance Co. v. Oak Park Motors, Inc., 19 Ill2d 66, 166 NE2d 23.

For these reasons the judgment is affirmed.

Judgment affirmed.

McNAMARA and LYONS, JJ., concur.