Karen Wendel TORMO and Henry Wendel, Plaintiffs,

v.

Milton YORMARK et al., Defendants.

FIDELITY UNION TRUST COMPANY and Keene National Bank, Third-Party Plaintiffs,

v.

Edward DEVLIN, Third-Party Defendant.

Civ. A. No. 298–73.

United States District Court, D. New Jersey.

May 12, 1975.

**1162**

Riker, Danzig, Scherer & Debevoise by Dennis J. O'Grady, Newark, N. J., for third-party plaintiffs.

Hannoch, Weisman, Stern & Besser by John E. Finnerty, Newark, N. J., for third-party defendant.

## OPINION

COOLAHAN, District Judge.

This case raises questions concerning a New York attorney's liability for negligence in transferring his clients' personal injury case to a criminally indicted New Jersey lawyer who subsequently embezzled the clients' funds. The questions arise on a motion for summary judgment by third-party defendant Edward Devlin, the New York lawyer, against defendants-third-party plaintiffs Fidelity Union Trust Company (Fidelity) and Keene National Bank (Keene).[1]

---

1. Subject matter jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332. Relevant jurisdictional facts appear in the Court's prior opinion in the case. *See Tormo v. Yormark*, Civil No. 298–73 (D.N.J. May 2, 1974) at 1–2, n. 2. Accordingly, New Jersey law governs the disposition of all "substantive" issues, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.

Ed. 1188 (1938), as well as conflicts of laws questions, *see Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941). Under New Jersey's choice of law principles, New Jersey's interest in this controversy predominates, and its domestic law shall be applied. *See Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973).

Pertinent procedural history may be briefly summarized. Devlin's clients, plaintiffs Henry Wendel and Karen Wendel Tormo,[2] brought the main action against six defendants to recover $148,997, the face amount of an instrument issued to settle the personal injury suit and wrongfully converted by Milton Yormark, the New Jersey lawyer consulted by Devlin. Against Fidelity, the depository bank, and Keene, a collecting and presenting bank, plaintiffs alleged causes of action for conversion under section 3–419(1) of New Jersey's Uniform Commercial Code, N.J.S.A. 12A:1–101 *et seq*. In addition, they alleged against Fidelity alone a cause of action for negligence based on its failure to take reasonable measures to discover whether Karen's endorsement on the draft was genuine. The banks in turn filed a third-party complaint for either contribution or indemnity against Devlin based on negligence toward his clients in selecting and failing properly to supervise Yormark.[3] Procedural facts unrelated to the present motion are set forth in the margin.[4]

Facts pertinent to Devlin's role in this case are confused and conflicting. A chronological history must begin on July 5, 1968. On that date Karen Tormo, then an unmarried infant and a citizen of New York, was involved in a boating accident in Dover Township, New Jersey. Shortly afterward, Karen's father, Henry Wendel, consulted Devlin concerning the matter. Devlin, whom Wendel had often consulted concerning his business affairs, visited the Wendel home on July 20 to discuss the incident. Although no retainer agree-

---

**2.** Plaintiffs are father and daughter. Karen was an unmarried infant when she sustained the personal injuries which underlie the present action. Her father was a named plaintiff in the resulting tort action. For the sake of convenience, plaintiffs collectively will be referred to as "the Wendels."

**3.** Devlin's lack of care in selection was not pleaded in the third-party complaint but has been argued by both parties on the present motion. The banks therefore are entitled to amend their pleading. Rule 15(a), Fed.R. Civ.P.

The banks have also asserted in their brief that Devlin negligently "failed to diligently file suit even after Yormark's fraud was discovered. . . ." Brief in Opposition to Third-Party Defendant's Motion for Summary Judgment at 17. That issue, however, has been neither pleaded nor argued. It is, moreover, meritless absent an allegation of resulting damage. The record reveals that Yormark's trustee account at Fidelity was closed on March 28, 1972. Askin Affidavit at 81. But the banks have not alleged that Devlin discovered Yormark's scheme prior to that date. They may, at any rate, seek to raise this issue at trial.

**4.** Named as defendants in the complaint were (1) Yormark, who accepted delivery of the instrument on his client's behalf, forged her endorsement upon it, deposited it in one of his checking accounts, and ultimately absconded with its proceeds; (2) National Grange Mutual Insurance Company (National Grange), which drew the draft, delivered

it to Yormark, and ultimately paid it; (3) William and (4) James Dorgan, insureds of National Grange, who agreed to settle the tort action for $150,000; (5) Fidelity, which accepted the draft from Yormark for deposit in his account, and forwarded it for payment by National Grange; and (6) Keene, which acted as an intermediary bank for Fidelity and National Grange.

Besides the $148,997 sought against National Grange, Fidelity and Keene, the complaint requested additional relief. Plaintiffs sued defendant Yormark to recover $150,000, representing the settlement sum. Payment was tendered to Yormark in two drafts, the first drawn in the amount of $148,997; the second $1,003. Only the first was desposited, forwarded, and presented for payment through named defendants Fidelity, Keene, and National Grange. The whereabouts of the second is unknown. Plaintiffs also sued the settling tortfeasors, William and James Dorgan, to set aside the settlement agreement for failure of consideration.

Plaintiffs have previously moved successfully for summary judgment against National Grange, *Tormo v. Yormark*, Civil No. 298–73 (D.N.J. May 2, 1974), and are no longer parties to the action. *See Tormo v. Yormark*, No. 74–1961 (3d Cir. Oct. 23, 1974) (dismissing appeal), *motion to reinstate denied* (Nov. 25, 1974). National Grange's prior motion for summary judgment against Fidelity has been denied, *Tormo v. Yormark*, Civil No. 298–73 (D.N.J. May 2, 1974), and the remaining issues have been set down for trial.

ment was executed, and Devlin's fee was not discussed,[5] Devlin agreed "to see what could be done with regard to settlement" of Karen's claim. Devlin Deposition at 10; see Wendel Deposition at 8–9.

Devlin initially learned of Yormark several days later through Yormark's telephone call to his office. Representing that he was "familiar with the accident," Yormark requested a personal meeting. Devlin Deposition at 18. Devlin agreed. Yormark, accompanied by an associate, met Devlin at the Kings County Courthouse in Brooklyn on July 23, 1968. He informed Devlin that "he and/or his representatives had discussed [the accident] with the Wendels and they had secured [Devlin's] name." *Id.* at 18. Explaining that he was a "negligence specialist," *id.* at 25, Yormark indicated that he was interested in handling the case. *Id.* at 20. Devlin declined this "offer," but promised to "consult him later if something developed." *Id.*

Devlin's testimony indicates that he informed Wendel of the incident several weeks later. Wendel, however, apparently could not recall having met Yormark. His response, according to Devlin, was "I had a lot of people in the home" after the accident. *Id.* at 21.

Wendel's testimony indicates that he had never conferred with Yormark and that Devlin never informed him of the meeting. Wendel Deposition at 10–11.

By June 1970, Devlin had not settled Tormo's accident claim, and she had married, changed her residence to Spain, and obtained Spanish citizenship. Since New York was no longer a proper venue for the action, see 28 U.S.C. § 1391(a), and since Devlin was not licensed to practice outside New York, he contacted Yormark, requesting that he bring suit in New Jersey. Whether either Wendel or Tormo actually participated in Devlin's decision is disputed. Devlin testified that he advised Wendel of his action "when the matter was referred to Yormark." Devlin Deposition at 23. Wendel's testimony flatly contradicts Devlin. He stated that Devlin failed to advise him of his decision until January 1971. At that time, moreover, Devlin allegedly stated that Yormark was a "good well-qualified lawyer." Wendel Deposition at 55–56.

Yormark, meanwhile, had been indicted in 1969 in Essex County, New Jersey, for conspiring fraudulently to obtain money from an insurance company.[6] He was subsequently convicted in January 1971, sentenced the following month to two consecutive 18-month prison terms,[7]

5. A conflict exists concerning whether Devlin's fee was ever discussed subsequently. Devlin has testified that a fee arrangement was never mentioned between him and Wendel. Devlin Deposition at 10. But Wendel testified that the question of Devlin's fee arose on three occasions: (1) during a visit by Devlin to the Wendels' summer home in August 1968, (2) during a telephone conversation on an unspecified date, and (3) during a discussion after Yormark had become involved in the case. Wendel Deposition at 8, 60. Although Devlin assertedly informed Wendel on the last occasion that he and Yormark had arrived at a fee arrangement, it is undisputed that these discussions never ripened into a formal fee agreement, either oral or written, between Devlin and Wendel.

6. The facts concerning Yormark's crime are reported in *State v. Yormark*, 117 N.J.Super. 315, 284 A.2d 549 (App.Div.1971), *certif. denied*, 60 N.J. 138 (1972).

7. Yormark was sentenced to 18 months in prison on one conspiracy count—12 months to be served in custody and six months on probation—and fined $1,000. In addition, he received the following sentences on three counts of obtaining money by false pretenses: (1) an 18-month prison term—12 months in custody and six months on probation—to run consecutively to the sentence on the conspiracy count, and a $1,000 fine; (2) an 18-month prison term—12 months in custody and six months on probation—to run concurrently with the first two terms, and a $1,000 fine; and (3) another 18-month prison term—which was suspended and to be served on probation—to run concurrently with the first two terms, and another $1,000 fine. Finally, Yormark was ordered to pay $16,750, representing one-fourth of the State's prosecution costs. *State v. Yormark*, 117 N.J.Super. 315, 323–24 (App.Div.1971), *certif. denied*, 60 N.J. 138 (1972).

and disbarred in February 1972.[8] The facts concerning Yormark's criminal misadventure received coverage in the New Jersey press,[9] but Devlin never discovered them until after Yormark had fully executed his scheme. Devlin Deposition at 26. Prior to consulting him, Devlin's only independent inquiry into Yormark's reputation consisted of ascertaining that he was listed as a licensed New Jersey attorney in a lawyers' directory. *Id.* at 25.

Devlin's testimony indicates that he believed his responsibilities terminated as a result of the transfer. He notified Wendel that "Mr. Yormark was going to handle the case," *id.* at 39, but never expressly advised him that he considered his own role to have ended. *Id.* Wendel's testimony indicates that he never understood that to be true. After the transfer, he testified, he contacted Devlin at least twice monthly concerning the case, Wendel Deposition at 19, and Devlin repeatedly assured him that it was progressing well. *Id.* at 48. Devlin admitted these conversations, but stated that never was any reference made as to his responsibilities in the matter. Devlin Deposition at 39.

Devlin, at any rate, never consulted Yormark concerning resolution of the case after the transfer.[10] Yormark communicated nearly exclusively with Tormo in Spain. Tormo, in turn, communicated with Wendel, and Wendel with Devlin. In early 1971 Yormark communicated a $150,000 offer of settlement to Tormo. She mailed him a letter indicating her willingness to accept that figure in February 1971. In March, misrepresenting to her that he needed further evidence of her intent, he induced her to sign a release. The release was delivered personally by one James Clare, an attorney for the insurance company whose services Yormark had solicited. Clare acted as a witness to the signing. Tormo neither read the document, *see* Tormo Deposition at 53–54, nor retained a copy for her records. *Id.* at 26.[11]

Wendel's testimony indicates that he advised Devlin of her signing this document, which he described as "needed for Mr. Yormark to prove that he wasn't bluffing." Wendel Deposition at 43. Wendel could not recall if he described Clare's role in the incident, *id.* at 50, and there is no indication that Devlin was advised of Tormo's February letter to Yormark. But, Wendel stated, Devlin expressed concern about the nature of the document and indicated that he would investigate the matter. *Id.* at 50–51. Tormo, further, testified that Devlin telephoned her to obtain a copy of the instrument, but she never complied because she had no copy herself. Tormo Deposition at 25. Devlin's testimony indicates that the call to Tormo never occurred, *see* Devlin Deposition at 60–61, but that Wendel "may have" advised him that his daughter signed a letter evidencing her willingness to settle. *Id.* at 62.

Shortly after the release was signed, the insurance company delivered two

---

8. *In re Yormark*, 60 N.J. 175, 287 A.2d 4 (1972).

9. Commencement of the insurance fraud trial was reported in the fall of 1970. *See* "Insurance Fraud Prosecution Begins," Newark Evening News, Sept. 24, 1970. Earlier, grand jury deliberations were reported concerning a related charge that Yormark attempted to bribe the Essex County Prosecutor. "Essex jury to resume deliberations," Newark Star Ledger, Dec. 4, 1969. "Lawyer acquitted of bribe charge," *id.*, Dec. 5, 1969. *See also* "2 lawyers disbarred for part in fraud plot," *id.*, Feb. 8, 1972; "MD, 2 lawyers fight conviction," *id.*, Mar. 21, 1972;

"Attorney indicted for dodging jail," *id.*, April 14, 1972.

10. Apparently the only correspondence between the two thereafter consisted of Yormark's forwarding several interrogatories and a notice of depositions through Devlin to Tormo, *see* Devlin Deposition at 46–51, and Devlin's forwarding to Yormark a medical bill sent him by a physician who had examined Tormo. *Id.* at 72–73. The physician's services had been rendered while Devlin was still actively handling the case.

11. Devlin has not argued on this motion that Tormo's contributory negligence would bar her recovery against him.

drafts totaling $150,000 to Yormark. Yormark, who was then appealing his conviction, and who had apparently been experiencing financial difficulties for several years,[12] forged Tormo's endorsement on the larger draft for $148,997. After depositing the item in a trustee account which he maintained at Fidelity, he immediately applied a substantial portion of the proceeds to his own use. *See* Askin Deposition Testimony at 89.

Tormo contacted him five weeks later concerning settlement developments. He assured her that all was well. Tormo Deposition at 29. In July 1971, while visiting her family in New York, she and Wendel met personally with Yormark. Yormark explained that three insurance companies involved in the settlement were debating their respective liabilities. Summer vacations, he warned, would further delay payment. *Id.* at 32. Wendel's testimony indicates that he communicated the substance of this meeting to Devlin. Wendel Deposition at 70. He purportedly complained of the delay involved, but he conveyed to Devlin no suspicion concerning Yormark. *Id.* Devlin's testimony indicates that this conversation never occurred. Devlin Deposition at 64–65.

After Tormo returned to Spain, she contacted Yormark nearly monthly. He put her off with similar excuses. In March 1972 she was unable to reach him at his office. Devlin, upon being apprized of this by Wendel, contacted Yormark's office and discovered he had disappeared. His investigation then revealed Yormark's embezzlement scheme.

## I

Devlin has predicated his motion for summary judgment against the banks on numerous grounds. His primary contention is that there is no factual issue concerning his own liability to the plaintiffs. Before addressing that contention, however, consideration must be given to Devlin's objection to use of Wendel's and Tormo's deposition testimony on the present motion. Devlin argues that it may not be considered against him because it was taken prior to the time he was brought into the case and therefore he was neither represented at, nor given reasonable notice of, its taking. *See* Fed.R.Civ.P. 32(a).

He rests his objection on *Taylor v. Rederi A/S Volvo*, 249 F.Supp. 326 (E. D.Pa.1966). The issue in *Taylor* was whether a third-party defendant was entitled to summary judgment where the only evidence against him was contained in the deposition of plaintiff's decedent which had been taken prior to the time he was brought into the action. The court held that the third-party defendant's motion must be granted since (1) only admissible evidence may be considered on summary judgment, and (2) the decedent's deposition, being unable to meet the requirements of Rule 26(d) (now 32(a)), Fed.R.Civ.P., would not be admissible as evidence against him at the trial.

Rule 32(a), the successor provision to Rule 26(d), requires, *inter alia,* that in order that deposition testimony may be admissible against any party, that party must have been "present or represented at the taking of the deposition" or must have had "reasonable notice thereof." By its terms, the rule applies "at the trial or upon the hearing of a motion or an interlocutory proceeding . . . ." Despite this language, however, courts and commentators have rejected the notion that the rule governs the use of deposition testimony at a hearing or a proceeding at which evidence in affidavit form is admissible. *See United States v. Fox,* 211 F.Supp. 25 (E.D.La.1962), *aff'd* 334 F.2d 449 (5th Cir. 1964); Wright & Miller, *Federal Practice & Procedure: Civil* § 2142 (1970). The reasoning behind this rejection is that deposition testimony

12. Yormark had repeatedly written checks drawn on insufficient funds against his checking accounts at Fidelity. *See* Angell Deposition Testimony at 27–28.

taken under oath, even if failing to satisfy Rule 32(a)'s requirements, is "at least as good as affidavits." *United States v. Fox, supra*, at 30.

This proposition is both supported by obvious good sense, and, according to this Court's reading, not contradicted by the *Taylor* opinion. *Taylor* cannot be read to hold that a deposition must satisfy Rule 32(a) in order to be considered on a motion for summary judgment, but rather that a deposition, like an affidavit, must satisfy Rule 56(e)'s requirement that it "set forth such facts as would be admissible in evidence . . . ." Fed.R.Civ.P. 56(e). The court held that it could not consider the decedent's deposition, not because Rule 32(a)'s predecessor barred its use on summary judgment, but because that provision would bar its use at trial. In the present case Rule 32(a) will not bar the admissibility of the facts set forth in the depositions of Wendel and Tormo because those facts will be offered, not in the form of prior deposition testimony, but in the form of testimony of presently available witnesses. So Devlin's reliance on *Taylor* is misplaced; the Court will consider the question of his liability to plaintiffs in light of all available deposition testimony.

That liability, as noted previously, rests upon an asserted breach of care either in selecting Yormark or in failing thereafter properly to supervise his handling of settlement negotiations.

Devlin's initial contention is that "[i]t is not at all clear that [he] was involved in an attorney-client relationship with the plaintiffs." Brief in Support of Third-Party Defendant's Summary Judgment Motion at 22–23. He points out that a formal retainer agreement was never executed and a fee never paid. But the law of New Jersey imposes the duties incident to such a relationship on one who merely "assumes to give legal advice and counsel." *Shoup v. Dowsey*, 134 N.J.Eq. 440, 475–76, 36 A.2d 66 (Ch. 1944). *Accord, In re Equitable Office Bldg. Corp.*, 83 F.Supp.

531, 562 (S.D.N.Y.1949); *Central Cab Co. v. Clarke*, 259 Md. 542, 270 A.2d 662, 666 (1970); *In re Carr's Estate*, 371 Pa. 520, 92 A.2d 213, 218 (1952). Neither contractual formality nor compensation or expectation of compensation is required. *Shoup v. Dowsey, supra*, 134 N.J.Eq. at 475–76, 36 A.2d 66. Devlin does not contend that his promise "to see what could be done with regard to settlement" was an agreement to perform services nonlegal in character. *Compare Ellenstein v. Herman Body Co.*, 23 N.J. 348, 129 A.2d 268 (1957), *with* Devlin Deposition at 10. That undertaking was sufficient as a matter of law to impose upon him the duties owed by an attorney to his clients in his relationship with the Wendels.

Devlin next asserts that proof of the fact that Yormark was indicted at the time of the referral is not evidence of negligence because there is no proof that he had actual knowledge of the fact and, being a New York lawyer, the knowledge cannot reasonably be imputed to him. This assertion has merit. Although the Court finds Devlin was under a duty of care in selecting Yormark to prevent harm subsequently caused by Yormark's criminal misconduct, Devlin could not be found negligent, after verifying Yormark's assertion that he was a licensed practitioner, simply for failing to inquire further into Yormark's reputation for honesty.

An actor generally has no duty to use care to prevent harm to another through the criminal acts of third parties not subject to his control. Prosser, *Torts* § 33 (4th ed. 1971); 57 Am. Jur.2d, Negligence § 63. *See also Goldberg v. Housing Authority of Newark*, 38 N.J. 578, 186 A.2d 291 (1962). But excepted from this rule is a defendant who expressly assumes such a duty. *See De la Bere v. Pearson, Ltd.*, 1 K.B. 280 (1908) (financial adviser who agreed to recommend "good stockbroker" negligently failed to discover broker's financial instability). An agent who is authorized to employ other agents to han-

dle his principal's affairs, moreover, is under a duty to select competent and otherwise proper agents. *Restatement, Agency 2d* § 405(2). Thus he might be liable to his principal for loss caused by the other agent's intentional wrongs if the harm were proximately caused by the employing agent's negligence. *See id.* Prosser, furthermore, has suggested that

> [t]here are other situations in which the defendant will be held liable because his affirmative conduct has greatly increased the risk of harm to the plaintiff through the criminal acts of others. The defendant may bring the plaintiff into contact with individuals of known criminal tendencies, as for example, by hiring them, under conditions in which the opportunity for crime is afforded.

*Prosser, supra,* § 33(citing cases).[13]

■ Although unaware of New Jersey case law in point, the Court assumes that New Jersey courts would follow these general authorities and apply them to find that Devlin was under a duty to exercise care in retaining Yormark to ensure that he was competent and trustworthy.[14] *See generally* 1A *Moore, Federal Practice* ¶ 0.309[2].

■ A jury which believed Wendel's testimony could find that the duty arose from Devlin's express representations as to Yormark's qualifications. It arose, at any rate, as a matter of law both from Devlin's duties as an agent toward his principal and from his affirmative conduct in bringing his clients into contact with a person of previously unknown character under circumstances affording the opportunity for crime.[15] But in setting a standard of conduct required to fulfill that obligation, a distinction must be drawn between Devlin and an allegedly negligent New Jersey lawyer. Although expressing no opinion as to the latter, the Court believes it would be unfair to require a New York practitioner referring a case to New Jersey counsel to know facts concerning him which are notorious only within New Jersey. Yormark's indictment was reported by the New Jersey press, but there is no evidence that it was given wider coverage. Devlin ought not be deemed negligent for failing to discover that fact absent proof of the latter sort. A contrary conclusion would subject out-of-state lawyers to possible liability for negligence for failure to consult not only a New Jersey lawyer's personal references and the legal ethics committee in the county in which he practices, but also the offices of local prosecutors. Yet a reference may be unaware of an

---

13. A reading of the cited cases suggests that the duty of care, as distinguished from ultimate liability for negligence, may arise from defendant's awareness of the opportunity for crime created by the circumstances of employment, even if defendant is actually unaware of the employee's criminal tendencies. *See, e. g., Kendall v. Gore Properties,* 98 U. S.App.D.C. 378, 236 F.2d 673 (1956) ; *Hipp v. Hospital Auth. of City of Marietta,* 104 Ga.App. 174, 121 S.E.2d 273 (1961).

14. The only New Jersey case law pertinent to the present problem which has been disclosed by the Court's research concerns another exception to the general rule stated above. That exception involves a defendant who is burdened by law with a general duty to protect the plaintiff from certain wrongs and who, by the exercise of reasonable care, could have prevented a wrong of that kind caused by the third party's wrongful conduct. *Prosser, supra,* § 33; *Restatement,*

*Torts 2d* § 302B, comment *c.* Thus New Jersey courts have held common carriers liable to their passengers for physical injuries caused by the foreseeable intentional mischief of employees, other passengers, and thugs. *See, e. g., Exton v. Central R.R. Co.,* 62 N.J.L. 7, 42 A. 486 (Sup.Ct.1898), *aff'd* 63 N.J.L. 356, 46 A. 1099 (E. & A. 1899) ; *Skillen v. West Jersey & Seashore R.R. Co.,* 96 N.J.L. 492, 115 A. 372 (E. & A. 1921) ; *Harpell v. Public Service Coordinated Transport,* 35 N.J.Super. 354, 114 A. 2d 295 (App.Div.1955). Business proprietors have been held similarly liable to invitees on their premises. *E. g., Reilly v. 180 Club, Inc.,* 14 N.J.Super. 420, 82 A.2d 210 (App.Div.1951) ; 40 *Am.Jur.2d, Hotels, Motels, etc.* § 108. *Cf. Mayer v. Housing Authority of Jersey City,* 84 N.J.Super. 411, 202 A.2d 439 (App.Div.1964).

15. See cases cited note 13, *supra.*

attorney's criminal misadventure, and proceedings before the State's committees on ethics are required to be kept confidential. *See* N.J.R. 1:20–3(b). Thus the burden of these additional inquiries greatly exceeds the risk that a referring attorney may cause harm to his client by entrusting his affairs to a lawyer who is known to be licensed by the State. And consultation with a prosecutor would, as a practical matter, simply never occur to an actor in Devlin's position. To impose such a burden on a party who neither holds himself out to the public as a referral agent nor, presumably, derives substantial income from transferring his client's business to other counsel would be unfair. Devlin relied, in making the referral, upon the State's judgment that Yormark was fit to practice law. State regulation of the legal profession is extensive, designed both to screen unqualified candidates at the outset, *see* N.J.R. 1:25 (duties of Committees on Character), and to ferret out the unfit thereafter, *see* N.J.R. 1:20–2 (powers and duties of committees on ethics). Under the circumstances, he could not be found negligent simply for failing to make further inquiries into Yormark's background.[16]

But even if as a matter of law Devlin was not required to know of Yormark's indictment, that conclusion does not resolve entirely the question whether a jury might find him negligent in retaining the New Jersey lawyer. Devlin's testimony shows that Yormark informed him that he had obtained his name through Wendel. But that testimony raises a question whether Wendel consulted Yormark or his "representatives," or whether the opposite was true. As an attorney, Devlin was required to realize that the latter situation would constitute a breach of the Code of Professional Responsibility. *See* DR 2–103(A), (B). The offense of soliciting legal employment from laymen constitutes a ground for disbarment. *See In re Introcaso*, 26 N.J. 353, 140 A.2d 70 (1958). But *cf. In re Bregg*, 61 N.J. 476, 295 A.2d 360 (1972). It evidences a lawyer's unworthiness of the trust and confidence essential to the attorney-client relationship. *In re Introcaso, supra*, 26 N.J. at 360, 140 A.2d 70. An attorney who knowingly entrusted his client's business to a lawyer who he had reason to believe was guilty of that offense would be clearly negligent either in making the referral at all, or in doing so without advising his client of his suspicions.

Whether Devlin made such an inquiry as was required by ordinary prudence is a question for the jury.[17] He testified that he informed Wendel of his meeting with Yormark. But he also testified that Wendel never expressly recalled having met Yormark. Rather, he remembered only that he had spoken to a number of people after the accident. Wendel's testimony, on the other hand, while not expressly denying that Devlin informed him of the meeting, indicates that he never learned of Yormark until some two and one-half years later. So a jury might conclude either that Devlin made no inquiry whatever, or that the inquiry which was made was insufficient; for even if Devlin's testimony

---

16. The Court is aware that summary judgment in negligence cases is exceptional. *See generally*, Wright & Miller, *Federal Practice and Procedure: Civil* § 2729 (1973). Yet it finds the present matter an appropriate one for such a determination. Opportunity for discovery has been abundant; the action was filed more than two years ago. At issue is the actor's standard of conduct. Except in doubtful cases, that question is for the Court. *See, e. g.*, Prosser, *Torts* § 37 (4th ed. 1971). The facts giving rise to the standard are clear and undisputed. The only

just and fair conclusion to be drawn from them, the Court finds, is certain. In short, reasonable men could not differ on the point.

17. In answering this question, the jury would, of course, be entitled to consider that Devlin consulted neither personal references nor New Jersey bar associations or ethics committees. Part I of this opinion holds only that these omissions would not alone make a *prima facie* case of negligence for the trier of fact.

were believed, the jury might find that he was not entitled to assume that Wendel would forget having contacted another attorney in the case.

Sufficient evidence exists to justify submitting the question of factual causation to the jury, for it cannot be assumed that, had Wendel been advised of the gravity of Yormark's conduct, he would have ratified Devlin's decision to retain him. *Cf. De la Bere v. Pearson*, 1 K.B. 280 (1908).

But there remains a question whether any legal principle precludes Devlin's conduct from being a proximate cause. Generally an actor's negligence, even if creating the opportunity for crime, cannot be a proximate cause of injury sustained by a third party's criminal wrong unless the actor should have realized both that the opportunity would be created, and that a third person might avail himself of it. *See Restatement, Torts 2d* § 448. The issue here is not whether Devlin should have realized that an opportunity for some crime had been created, for he placed a person of doubtful character in a fiduciary relationship with the plaintiffs; he entrusted him with authority to negotiate their affairs and to receive property on their behalf. The issue, rather, is whether Devlin ought to have realized that Yormark would seize that opportunity to embezzle his clients' funds. Conceivably, Devlin had no reason to believe that, because Yormark had resorted to unethical practices to obtain clients, he might also resort to embezzlement to obtain their property.

But no rule of logic or principle of policy would be served by thus fragmenting the nature of the risk created. If prudence requires an attorney to refrain from entrusting his client's case to another lawyer who may be guilty of "touting" or employing "runners," this is so not because the practice of touting itself presents a particular risk of harm to the client. Rather, it is true because the ethical violation evidences a general lack of trustworthiness. So all conduct amounting to a breach of fiduciary trust —whether it be embezzlement, fraud, or dealing in the client's property for one's own benefit—must be considered within the risk making the conduct negligent. Such conduct is both a risk foreseeable to the actor and a consequence for which he may justly be held liable. A different case would be presented if the alleged "touter" caused injury to his client by a criminal assault. But those facts are not before the Court.

Devlin has urged the Court to consider *Caputzal v. The Lindsay Co.*, 48 N.J. 69, 222 A.2d 513 (1966), in ruling upon the question of proximate cause. In *Caputzal,* the New Jersey Supreme Court ruled that the manufacturer and installer of a defective water softener was not liable for damages to the plaintiff purchaser who suffered a heart attack upon seeing brown, discolored water flowing from his bathroom faucet. The plaintiff had drunk a cup of coffee made from water drawn from the kitchen tap several moments before. He claimed his injury was caused not be ingesting the stuff, but by fright upon seeing it spew from the faucet. Resting its ruling in part upon the question of legal cause, the Court held that plaintiff's heart attack was too extraordinary a consequence of defendant's assumed negligence in manufacturing or installing the water apparatus to permit a finding of liability. 48 N.J. at 79, 222 A.2d 513.

*Caputzal* does not present a problem even remotely similar to the present case. That case might have pertinence to the situation just distinguished, involving harm caused by an unethical lawyer's assault on his client where liability was sought to be imposed on the attorney who retained him for negligently failing to discover his lack of trustworthiness. Or, the case might apply to the present facts if Devlin were sought to be held liable for damages resulting from a heart attack suffered by his client upon learning of Yormark's embezzlement scheme. But the present case is less bizarre. The third-party de-

fendant's alleged negligence in selecting the New Jersey lawyer could be found a proximate cause of the damages sustained.

## II

As to that part of the third-party complaint alleging the negligent breach of a duty of supervision, Devlin's motion rests initially on the assertion that, after his clients had ratified his decision to retain Yormark, he (Devlin) "could reasonably feel that his official involvement in the case had ended. . . ." Brief in Support of Third-Party Defendant's Motion for Summary Judgment at 24. But this assertion is untenable as a basis for summary judgment. The Court has not been informed of any rule of law which terminates the relationship automatically upon the client's ratification of his attorney's decision to consult a lawyer in a foreign jurisdiction for the purpose of instituting suit there. Generally, absent death or legal insanity of either party, the relationship terminates only upon the accomplishment of the purpose for which the attorney was consulted, or upon mutual agreement of the parties. *See* 7 *C.J.S., Attorney and Client* § 108. Devlin and the plaintiffs never entered an express oral or written agreement either delimiting the scope of his initial undertaking or mutually rescinding their relationship. So the question when his responsibilities terminated must depend upon all the facts surrounding both their July 1968 meeting and the referral incident two years later. But the deposition testimony concerning those facts is so flatly contradictory that the inappropriateness of summary judgment on the ground asserted is obvious.

Devlin has not urged the Court to consider whether a New York attorney generally ought not be under a duty to exercise any supervision over a New Jersey lawyer's conduct in a New Jersey law suit. But the merits of that notion would not have to be determined in this case at any rate. The record is laced with conflicting testimony concerning what, if any, supervisory responsibilities Devlin assumed by virtue of his express representations to Wendel concerning the progress of the case. Wendel, for example, has asserted, and Devlin has denied, that the latter repeatedly assured him that the matter was proceeding well. He (Wendel) also stated that Devlin represented that he would investigate the nature of the document signed by Tormo in March 1971. Therefore summary judgment on the question whether a duty of supervision existed would also be inappropriate.

A jury which believed that Devlin made either of these representations might conclude that he negligently breached a duty of care in supervising Yormark's handling of the case. If Devlin were found to have promised to investigate the March 1971 document, ordinary prudence would compel him to pursue that inquiry with reasonable diligence.[18] A jury might certainly find that his unsuccessful attempt to procure a copy of the document from Tormo was insufficient to conform his conduct to that standard. Omission to contact Yormark for that purpose might be deemed culpable negligence which proximately caused plaintiffs' loss.

Second, if Devlin were found to have represented that the case was proceeding normally, a jury might find him negligent in omitting all con-

---

18. Even a jury which found Devlin made no such promise might conclude that he was under a duty to investigate the document on another basis. Wendel's testimony contains a suggestion that Devlin knew or should have known that Yormark misrepresented to Tormo the nature of the document. It reveals that Wendel may have advised Devlin of Mr. Clare's role in the incident. Ordinary prudence would require an attorney in Devlin's position to pursue with diligence the question whether Yormark was engaged in fraud. A jury which believed Wendel could conclude that Devlin's omission to consult Yormark about the matter constituted negligence.

tact with Yormark for a 12- or 13-month period. It would be entitled to consider the question in light of what Devlin knew concerning the suspicious circumstances under which Yormark initially learned of Devlin, and in light of the fact that Devlin had had no prior dealings with Yormark and had made no effort to ascertain his reputation for competence or honesty among his peers. The facts that his client's suspicions were not aroused by the delay in settlement negotiations and that Devlin had no knowledge that Yormark was engaged in fraud or embezzlement would also be entitled to consideration by the trier of fact. They are not, however, dispositive as a matter of law. Devlin was required to know that Yormark owed his clients a duty to represent their interests zealously. *See* DR 7–101(A)(1), (2). If Devlin, having a duty to supervise the New Jersey lawyer, failed to use proper care to ascertain whether Yormark was ignoring that responsibility, then a finding of negligence could be sustained. That negligence could be found to be a legal cause of the plaintiffs' loss, but only if the jury also found that Yormark's ruses were disentitled to belief by Devlin. A contrary finding on the last point would preclude a determination that Devlin's omission had any necessary causal relation to the ultimate harm. But that issue is not for the Court to decide on this motion.

Devlin's last contention concerning his own negligence is that, under the facts of the case, all plaintiffs' causes of action against him would be barred by their ratification of his decision to retain Yormark. He rests this sweeping assertion on *Wildermann v. Wachtell,* 149 Misc. 623, 267 N.Y.S. 840 (Sup.Ct. Trial Term 1933). In *Wildermann* defendant Wachtell, a New York attorney, was consulted by the plaintiff concerning an unliquidated claim against the executors of a Pennsylvania estate. The attorney advised the plaintiff that Pennsylvania counsel would have to be re-

tained to bring suit in that State and recommended Gumbes for that purpose. The plaintiff agreed that Gumbes should be retained and signed a formal agreement employing both Gumbes and the defendant. Gumbes thereafter negligently failed to file a timely *lis pendens* in Pennsylvania and plaintiff's judgment, when finally secured, was worthless.

The court found expressly that "Wachtell himself was not negligent either in retaining Gumbes or in assuming that Gumbes would take care of filing the necessary *lis pendens* in Pennsylvania." 267 N.Y.S. at 841. The issue framed for decision was whether an attorney, having retained a Pennsylvania attorney to bring a Pennsylvania suit, "becomes ipso facto liable for any negligence of the foreign attorney, even though the client has been informed of the necessity and reason for the retainer and has approved the course and choice of attorney." *Id.* The court answered this question negatively, reasoning that a contrary conclusion would burden a practicing attorney with "hazards which he is not qualified either to anticipate or to prevent."

The banks argue that *Wildermann* is distinguishable because the plaintiff's consent in that case was given in advance of the decision to hire the foreign attorney. But the Court need not rule upon that contention, for the holding of the case is clearly inapposite to the issues presented here. The question of Devlin's liability turns upon whether he was negligent either in selecting Yormark or in supervising him. Those issues were expressly resolved in the attorney's favor in *Wildermann.* The question of liability there turned solely upon whether the foreign attorney's negligence ought to be imputed to the defendant. The banks, however, have not sued Devlin on the theory that Yormark was acting as his agent when he embezzled the plaintiffs' funds.

In accordance with parts I and II of this opinion, Devlin's motion for summa-

ry judgment is granted on that portion of third-party plaintifffs' claim alleging negligence in failing to discover the indictment pending against Yormark at the time of the referral. In all other respects, the motion is denied.

### III

Consideration must next be given to three arguments advanced by Devlin to show that the banks have no claim for either contribution or indemnity against him.

First, Devlin argues, even assuming that his negligence caused injury to the Wendels, the banks can recover nothing from him because "there was no interest or relationship between [the banks and himself] which was entitled to legal protection. . . ." Brief in Support of Third-Party Defendant's Summary Judgment Motion at 14.[19] The difficulty with this proposition is that its initial assumption flatly contradicts its basic premise. If it be assumed, first, that Devlin's negligence caused the Wendels' loss, and that Fidelity's negligence also was a concurrent cause of the same harm, then Fidelity would have, upon payment of all or a part of a resulting judgment in excess of its pro rata share,[20] a statutory right to recover contribution from Devlin. See N.J.S.A. 2A:53A–1, 2, 3; *Kennedy v. Camp*, 14 N.J. 390, 395, 102 A.2d 595 (1954); *Young v. Steinberg*, 53 N.J. 252, 255, 250 A.2d 13 (1969); *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 N.J. 55, 75–76, 159 A.2d 97 (1960). The "interest entitled to legal protection" is the statutory right. Nothing more is required.

If, on the other hand, it be assumed that Devlin's negligence caused the Wendels' loss, and that the banks were liable without fault for the same

19. Devlin relies primarily upon *Aiello v. Grace*, 99 Ill.App.2d 445, 241 N.E.2d 675 (1968). The issue in that case was whether the Graces, victims of a real estate broker's scheme to defraud them of several checks totaling $24,874.18, could recover damages against one Kilroy, a personal friend of the broker, who innocently afforded the broker the opportunity to convert their funds by maintaining a checking account in his own name for his friend's use. 241 N.E.2d at 678–79. The court denied recovery on the grounds that the Graces never relied on Kilroy in entrusting their funds to the broker, and that Kilroy's conduct was not the proximate cause of their loss. 241 N.E.2d at 679.

*Aiello* is irrelevant both because it involved a claim not for contribution or indemnity, but for damages sustained by the Graces, and because Kilroy was conceded to have "innocently," 241 N.E.2d at 679, afforded the opportunity for the conversion scheme to occur. The banks have not sued Devlin for injuries to themselves, and Devlin, in advancing the present argument, has asked the Court to entertain the assumption that he was negligent.

Devlin also relies on the common law rule that an attorney acting in his professional capacity is not liable to persons other than his client for the consequences of his negligence. *E. g., Savings Bank v. Ward*, 100 U.S. 195, 200, 25 L.Ed. 621 (1880); *Sachs v. Levy*, 216 F.Supp. 44 (E.D.Pa.1963); 7 Am.Jur.2d, *Attorneys at Law*, § 196; 7 C.J. S., *Attorney and Client*, § 52. That rule also has no bearing on the present case. As already noted, the banks' claims against Devlin are predicated not upon the breach of a duty of care owing to them, but upon the existence of a duty to provide contribution or indemnity in regard to a common liability owing to Devlin's clients.

An attorney's common law immunity from liability for negligence to third parties would bar only a contribution suit brought *by* his clients for injuries jointly or severally caused *to* a third party. *Cf. Kennedy v. Camp*, 14 N.J. 390, 102 A.2d 595 (1954). *See also Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 N.J. 55, 75–76, 159 A.2d 97 (1960).

20. The fact that Fidelity's right has not yet accrued by virtue of paying a judgment does not affect the sufficiency of its third-party complaint to state a claim for relief. This is so even if a different result would obtain under New Jersey law, a question that need not be discussed. The right to file a third-party action is governed by Rule 14(a), Fed.R.Civ.P., which allows a third-party complaint to be filed against a person "who is or may be liable to him [third-party plaintiff] for all or part of the plaintiff's claim . . . ." That provision is binding on federal courts. *See Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

loss, *see* N.J.S.A. 12A:3–419, then the banks would have, upon payment of a judgment resulting against them, a common law right to be indemnified by Devlin. *See, Adler's Quality Bakery, Inc. v. Gaseteria, Inc., supra,* 32 N.J. at 79–80, 159 A.2d 97; *Daily v. Somberg,* 28 N.J. 372, 385, 146 A.2d 676 (1958); *Hut v. Antonio,* 95 N.J.Super. 62, 69, 229 A.2d 823 (App.Div.1967); *Public Service Elec. & Gas Co. v. Waldrup,* 38 N.J.Super. 419, 432, 119 A.2d 172 (App.Div. 1955). Again, the legally protected interest is the right to be indemnified for a liability which, in fairness, Devlin ought to bear. Prosser, *Torts* § 51 (4th ed. 1971); Davis, "Indemnity between Tortfeasors: A Proposed Rationale," 37 Iowa L.Rev. 517, 546 (1952).

Devlin next contends that neither remedy will lie in the banks' favor because his conduct toward the plaintiffs "cannot be thought to have any direct, substantial or proximate causal connection with any damages that third-party plaintiffs are ordered to pay or to contribute in this case." Brief in Support of Third-Party Defendant's Summary Judgment Motion at 20. But neither remedy turns upon whether Devlin proximately caused a judgment to be entered against the banks. The only issue of proximate causation in this case is whether Devlin's conduct proximately caused the plaintiffs' loss, and the Court has already entered its ruling on that point.

Devlin's third contention is that Fidelity is barred from seeking indemnity because of its own primary negligence. It is settled New Jersey law that indemnity is available only to a wrongdoer whose liability is merely constructive or vicarious. *See, e. g., Public Service Elec. & Gas Co. v. Waldrup, supra,* 38 N.J.Super. at 432, 119 A.2d 172. Unless Fidelity can establish that it was free from actual fault in handling the instrument, therefore, its claim for indemnity must ultimately be denied.

Fidelity has interposed two objections to Devlin's contention. The first is procedural, the second substantive. Initially, noting that Devlin's answer did not assert Fidelity's negligence as an affirmative defense, it argues that that issue cannot be considered on this motion for summary judgment. It reasons that a party's failure to plead any matter bars him from raising it on summary judgment unless he first moves formally under Rule 15(a), Fed.R.Civ.P., to amend his pleading. That proposition's validity need not be decided since analysis indicates that freedom from negligence constitutes an essential element of an indemnity claim which must be pleaded in the complaint. A simple denial of its allegations, therefore, places in issue the indemnitee's negligence.

State law governs the allocation of burdens of persuasion on elements of nonfederal claims in diversity cases. *See, e. g., Palmer v. Hoffman,* 318 U.S. 109, 116–17, 63 S.Ct. 477, 87 L.Ed. 645 (1943); Fed.R.Ev. 302 (1973). Rule 8, Fed.R.Civ.P., however, governs the allocation of burden of pleading such matters in these cases. *See,* Wright & Miller, *Federal Practice & Procedure: Civil* § 1204 (1969). Subsection (C) of that rule enumerates certain matters which must be pleaded as affirmative defenses. The matters enumerated, however, are illustrative only; "any other matter constituting an . . . affirmative defense" must also be pleaded as a separate defense. Fed.R.Civ.P. 8(c). Thus in instances not specifically covered by the rule, the last quoted clause requires the court to formulate and apply an appropriate definition, based both upon applicable or analogous precedent and upon general pleading considerations. Since the burden of pleading may in certain cases be "outcome determinative," *see McCormick, evidence* § 347 (2d ed. 1972), and since clarity is served by allocating the burden of pleading a particular matter to the party carrying the burden of persuasion on that point, it is most appropriate to consult State law in

making this formulation. *See, e. g., Seal v. Industrial Electric, Inc.,* 362 F.2d 788 (5th Cir. 1966).

The matter under consideration is not expressly covered by Rule 8(a), nor is the Court aware of case law, either state or federal, deciding the point.[21] General considerations in allocating the burden of pleading, then, must be consulted. They include: (1) logic, *i. e.,* whether the matter to be pleaded can be said, on some basis, to constitute either a necessary ingredient of plaintiff's cause of action or a new matter which will bar an otherwise meritorious claim for relief; (2) fairness as to problems of proof, *i. e.,* whether plaintiff or defendant has more ready access to evidence relevant to the matter to be pleaded; and (3) policy, that is, whether the matter to be asserted is one which is treated indulgently or with disfavor by the courts. *See generally,* Wright & Miller, *Federal Practice & Procedure: Civil* § 1271 (1969); McCormick, *Evidence* § 337 (2d ed. 1972).

██ ██ An application of these considerations to the present problem, in light of analogous New Jersey precedent, compels the conclusion that the party seeking indemnity must plead affirmatively his own freedom from fault. First, the language in which the New Jersey rule allowing indemnity is couched makes the right expressly contingent upon the indemnitee's freedom from actual fault. *See, e. g., Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,* 32 N.J. 55, 80, 159 A.2d 97 (1960); *Daily v. Somberg,* 28 N.J. 372, 385, 146 A.2d 676 (1958). Logically, then, freedom from fault can be said to constitute an essential element of the right to recovery, not a new matter whose existence will defeat an otherwise meritorious claim. Second, since it is the indemnitee's conduct which is in question, he will nearly always have greater access to proofs concerning the degree of care with which he proceeded. In some cases, such as the present, where the conduct at issue concerns the internal operating procedures of a commercial enterprise, his advantage will be substantial. Finally, claims for indemnity have not been indulgently treated by New Jersey courts. Rather, they have narrowly confined the instances in which indemnity will be allowed to cases in which the indemnitee's "negligence" is merely vicarious or technical. *E. g., Daily v. Somberg, supra.* These courts have rejected a rule, followed in other jurisdictions, of allowing indemnity to a wrongdoer whose negligence is merely "passive." *See, e. g., Public Service Elec. & Gas Co. v. Waldrup,* 38 N.J.Super. 419, 443, 119 A.2d 172. Thus since the banks' third-party complaint was required to allege affirmatively their freedom from fault, and since Devlin denied all allegations material to their claim for indemnity, the Court holds that Fidelity's negligence was put in issue and may be ruled upon on summary judgment.

The facts surrounding Fidelity's handling of the converted item are these. Yormark deposited it at Fidelity on March 25, 1971. The item named as joint payees "Karen Wendel Tormo and Milton Yormark, Attorney." Fidelity's usual banking procedures require a cashier, upon accepting an item for deposit in a customer's account, to verify the amount of the item presented and the fact that it has been endorsed. Askin Deposition Testimony at 38–39. These procedures do not, however, require the cashier to verify the authenticity of any endorsement. *Id.* By contrast, upon presentment of an item for payment, cashiers are required to verify each endorsement either by prior knowledge of the signature or by comparing the signature with a separate copy thereof. *Id.* at 36–37. The differing treatment, ac-

---

21. In *Public Service Elec. & Gas Co. v. Waldrup, supra,* the court did note that the alleged indemnitee's primary negligence had been pleaded as an affirmative defense at the trial level. 38 N.J.Super. at 424, 119 A.2d 172. But the court neither discussed nor ruled upon the question whether that procedure was obligatory.

cording to one of Fidelity's managing officers, rests upon the need for customer convenience and upon the bank's consequent reliance upon customer honesty in making any deposit. *Id.* at 39–40.

Yormark's deposit was apparently handled according to the bank's normal procedures. At the time, however, Fidelity's management personnel were aware that Yormark had been indicted for conspiracy to obtain money by fraud. Angell Deposition Testimony at 26.[22] They were aware, moreover, that he had repeatedly written checks drawn upon insufficient funds over nearly a two-year period. *Id.* at 27–28. Despite this knowledge, Fidelity exercised no unusual caution in handling deposits in Yormark's accounts.

 Fidelity does not deny that it was under a duty to endorsers to use care in handling Yormark's deposits. It contends, however, that, according to standard commercial practice followed by collecting banks in handling items for depositors, it was demonstrably not negligent. The Court finds this assertion erroneous for three reasons. First, the deposition testimony on which it is based contains no indication that it purports to describe anything but the standard procedures followed by Fidelity, not those followed by the banking community generally.[23] *See* Askin Deposition Testimony at 39–40. Second, proof of adherence to an industry-wide practice or custom, although admissible as evidence of negligence or due care, is not dispositive. *Bexiga v. Havir Mfg. Corp.*, 60 N.J. 402, 411, 290 A.2d 281 (1972); *Wellenheider v. Rader*, 49 N.J. 1, 7, 227 A.2d 329 (1967); *Shafer v. H. B. Thomas Co.*, 53 N.J.Super. 19, 22–23, 146 A.2d 483 (App.Div.1958). Third,

the answer to the question what constitutes standard practice for any business or industry must vary with changed circumstances. Prosser, *Torts* § 33 (4th ed. 1971). So Fidelity's persistence in following normal procedures in light of a known and unusual risk might itself constitute negligence. *See Texas & Pac. Ry. Co. v. Behymer*, 189 U.S. 468, 23 S. Ct. 622, 47 L.Ed. 905 (1903).

The precise conduct at issue is Fidelity's officers' omission to instruct the bank's cashiers to exercise some special caution in handling items presented by Yormark for deposit. The gravity of risk involved was substantial. Under ordinary circumstances, the bank's standard practice of failing to verify the authenticity of endorsements on deposited items poses some risk of loss to owners and prior endorsees. Since the bank ordinarily would have no reason to suspect its customer of dishonesty, the quantum of risk in any particular case would be proportional to the incidence of unlawful transactions in the bank's area of operation over any given time period. In Yormark's case, however, the quantum of risk was significantly greater.

The bank knew that Yormark was an attorney and that he had established separate "personal" and "trustee" accounts under its auspices. Presumably then it also knew, or should have known, that he was dealing regularly with the property of persons to whom he owed a fiduciary duty. It also knew, based upon receipt of numerous checks drawn upon insufficient funds, that Yormark was either extremely careless or financially unstable. Finally, it knew that he had been indicted for conspiring to obtain money by fraud. Thus it also

---

22. Fidelity had also been served with a subpoena in connection with a grand jury investigation of Yormark. Askin Deposition Testimony at 66–67.

23. Mr. Askin never stated nor intimated during his testimony that he was purporting to speak as an expert witness concerning banking practices generally. His references to a manual used in training Fidelity's cashiers, for example, contained no indication of the manual's source nor the breadth of its circulation. His use of the pronoun "we" in explaining the standard procedures in question apparently was designed to refer to Fidelity itself.

knew, or was bound to discover, that that indictment ripened into a conviction. The likelihood that a demonstrably dishonest attorney, chronically short of funds, might attempt to use his fiduciary position to convert a client's check to his own use is hardly remote.

The utility of the bank's inaction, however, was no greater in Yormark's case than in the case of an ordinary customer. Clearly the unusual risks in handling Yormark's deposits substantially outweighed the utility of allowing the Yormark accounts to be handled in a business-as-usual fashion. *Cf. Belmar Trucking Corp. v. Am. Trust Co.*, 65 Misc.2d 31, 316 N.Y.S.2d 247 (N.Y.City Ct.1970); *Van Gohren v. Pac. Nat'l Bank of Washington*, 8 Wash.App. 245, 505 P.2d 467, 473 (1973). A question exists as to what action the bank could have taken to eliminate or reduce that risk. Perhaps requiring Yormark to furnish the bank with copies of the signatures of all endorsers on an instrument might have proved futile. If he were a determined forger, Yormark might have forged a copy of the endorser's signature as he did the endorsement itself. *But cf. Belmar Trucking Corp. v. Am. Trust Co., supra,* at 251–52. Yet he also might have been deterred by an awareness that his account was under close scrutiny. Requiring him to furnish each endorser's address and telephone number, moreover, would have afforded the bank an independent basis for determining each endorsement's authenticity. Neither of these alternative courses would be unduly burdensome. The bank utilizes its deposits to generate income. Involved here was a single customer account posing a known and substantial

risk to endorsers to whom the bank owed a duty of care. In fairness, Fidelity was required as a matter of law to take some precaution to protect them from the foreseeable and substantial risks posed by Yormark's misconduct.[24] Accordingly, Devlin's motion for summary judgment against third-party plaintiff Fidelity on its claim for indemnity will be granted.[25]

## IV

Two additional matters relating to the banks' claim for contribution, although not raised by Devlin, require consideration. The first is the question whether Devlin's alleged liability to the Wendels is of the sort which would entitle him to indemnity from the banks if he were held liable for plaintiffs' loss. If this were the case, the banks would be barred from seeking contribution. *See* N.J.S.A. 2A:53A–3. The answer to the question is clearly negative, however. The settled rule in New Jersey is that indemnity will be allowed to a joint tortfeasor only if his liability is merely "constructive" or "vicarious." *E. g., Daily v. Somberg*, 28 N.J. 372, 385, 146 A.2d 676 (1958); *Hut v. Antonio*, 95 N.J.Super. 62, 69, 229 A.2d 823 (App.Div.1967); *Public Service Elec. & Gas Co. v. Waldrup*, 38 N.J.Super. 419, 432, 119 A.2d 172 (App.Div. 1955). "Constructive" or "vicarious" liability is liability which is imputed by law, without regard to actual fault. *See, e. g., Mayer v. Fairlawn Jewish Center*, 38 N.J. 549, 560–61, 186 A.2d 274 (1962). But liability is not "vicarious" merely because resting upon "passive" rather than "active" negligence. *See Public Service Elec. & Gas Co. v. Waldrup, supra,* 38 N.J.Super. at 443,

---

24. The Court's conclusions as to the appropriateness of summary judgment on this point conform substantially with those set forth in note 17 *supra.*

25. The claim for indemnity of third-party plaintiff Keene might, as a technical matter, be permitted to proceed to trial. In practical effect, however, Keene will be entitled to recover against Fidelity any liability imposed

upon it. *See* N.J.S.A. 12A:4–207(2). Among the parties to the present motion, then, any liability will rest either upon Fidelity alone, or upon Fidelity and Devlin jointly. Convenience in drafting an order in this matter would be served by treating the banks as joint alleged indemnitees and granting summary judgment on all claims for indemnity against the third-party defendant.

119 A.2d 172. Devlin's liability is sought to be predicated upon actual fault in failing properly to supervise Yormark, not upon negligence imputed by law. It is immaterial, therefore, that his omissions might be characterized as "passive" wrongs. He would not be entitled to indemnity for the loss caused by his conduct.

The second matter requiring consideration is twofold: first, whether the terms of the Joint Tortfeasors Contribution law allowing contribution in regard to a "wrongful act," N.J.S.A. 2A:53A-3, bar an action for contribution based on a liability arising without fault under N.J.S.A. 12A:3-419(1), and, second, whether the policy underneath the latter statute's absolute liability provisions bars such action against an alleged concurrent wrongdoer.

The New Jersey Supreme Court considered similar questions in *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 N.J. 55, 159 A.2d 97 (1960). In that case the Court rejected the notion that the term "wrongful act" in the contribution statute "necessarily connotes fault, thus excluding from the benefits of the Contribution Law any party whose liability is based on liability without fault." *Id.* at 74, 159 A.2d at 106. It held that the term included certain damages caused by the operation of an aircraft, for which the aircraft owner was absolutely liable by statute. *See id.* at 74-75, 159 A.2d 97. Convinced that the Legislature had power to impose absolute liability for damages so caused, *see id.* at 67-72, 159 A.2d 97, the Court concluded that the "wrongful act" consisted simply of causing damages in the statutorily defined manner. *Id.* at 75, 159 A.2d 97.

▉ The Court finds that the term "wrongful act" in N.J.S.A. 2A:53A-3 also includes causing damages in the manner defined in N.J.S.A. 12A:3-419(1). That some absolute liabilities for paying an instrument over a forged endorsement, *i. e.*, those to transferees and subsequent collecting banks, *see* N.J.S.A. 12A:4-207(2), are expressed in terms of "warranty" rather than tort liability, does not compel a different result. The bank remains liable to the owner for conversion. *See* N.J.S.A. 12A:3-419(1). Fairness would not be served by denying the banks the right to seek contribution merely because their liability, imposed by law, rather than bargained for through negotiation, is phrased in the language of contract.

The *Adler's Bakery* Court also considered the argument that permitting the aircraft owner in that case to seek contribution from an alleged joint wrongdoer would frustrate the purpose underlying the absolute liability provision. Pointed out was that provision's design to eliminate problems of proof concerning the proximate cause of injuries resulting from the falling aircraft. Noting, however, that the statute's terms applied only to innocent victims, the Court concluded that the alleged wrongdoer was outside the protected class and that the Legislature intended ordinary tort principles to govern problems of proof between him and the aircraft owner. *Id.* at 78, 159 A.2d 97.

▉ Again, the Court finds the reasoning of *Adler's Bakery* controlling. The absolute liability provisions of New Jersey's Uniform Commercial Code applicable to collecting banks operate only in favor of an innocent owner, *compare* N.J.S.A. 12A:3-404 *with Salsman v. National Community Bank of Rutherford*, 102 N.J.Super. 482, 246 A.2d 162 (Law Div.1968), "transferees" and "subsequent collecting banks" who take the item in "good faith," N.J.S.A. 12A:4-207(2), and "payor banks" and "other payors" who in good faith pay or accept the item," N.J.S.A. 12A:4-207(1). These provisions, designed to distribute risk of loss due to forgery among parties dealing with an instrument during the course of negotiation or payment, cannot reasonably be construed to operate in favor of an alleged joint wrongdoer outside the chain of negotiation. The equities between a collecting bank and such a party have not been addressed by the Legislature. Presuma-

bly, they are to be governed by ordinary tort principles. Neither section 3–419 nor section 4–207 of Title 12A bars the banks from seeking contribution from Devlin.

## V

 Third-party defendant has also moved alternatively for more specific answers to certain interrogatories. His failure to comply with Local Rule 15(D), requiring the interrogatories in question to be attached to the moving papers if they have not already been filed with the Clerk, however, precludes a ruling on that request. Accordingly, relief will be denied, without prejudice to a renewal of the motion in accordance with the cited local rule.

Summary judgment shall be granted on third-party plaintiffs' claim for indemnity.[26] They may proceed to trial on their claim for contribution in accordance with Parts I and II of this opinion. Pursuant to Part I, the banks will not be entitled to prove Devlin's negligence by introducing evidence of Yormark's criminal indictment, conviction, or disbarment. Counsel shall submit an order.