Filed 7/24/13  Connelly v. Hayashi CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SCOTT CONNELLY, | |
| Cross-complainant and Appellant, | G046247 |
| v. | (Super. Ct. No. 30-2010-00371616) |
| JOE HAYASHI et al., | O P I N I O N |
| Cross-defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Nancy Wieben Stock, Judge.  Reversed.

Krane & Smith, Samuel Krane and Ralph C. Loeb; Law Offices of Becky Walker James, Becky Walker James and Kathryn Lohmeyer for Cross-complainant and Appellant.

Klinedinst, Heather L. Rosing and David M. Majchrzak for Cross-defendants and Respondents.

\*          \*          \*

Cross-complainant Scott Connelly alleges cross-defendant Joe Hayashi, Connelly's alleged attorney, committed fraud and breached fiduciary duties. Hayashi was hired to draw up the paperwork creating a new business venture between Connelly and various individuals. Hayashi allegedly deceived Connelly as to the identity of one of the individuals involved in the business who was recently convicted of criminal fraud in connection with other business dealings. Hayashi also allegedly misrepresented the nature of one the agreements Connelly signed, resulting in the contribution of assets to the new venture Connelly had not intended. Connelly did not read the agreement before signing it, relying instead on Hayashi's representations of what it contained. Hayashi also allegedly fraudulently induced Connelly to refrain from timely serving a "reversion notice" that would have unwound the whole transaction.

The court sustained demurrers to various causes of action sounding in fraud and professional negligence. The allegedly fraudulently-induced agreement, which was attached to the cross-complaint, stated that Hayashi did not represent Connelly, only the newly formed entity. The court ruled Connelly was bound by that admission, and, as a result, Connelly could not assert professional negligence claims. Nor could Connelly establish justifiable reliance for the fraud claims due to his failure to read the agreement. The court also found the fraud claims lacked specificity.

We reverse. Connelly's allegations establish an implied attorney-client relationship with Hayashi. Connelly is not bound by contrary "admissions" in the agreement he signed. Normally facts in an attached exhibit trump contrary facts alleged in a complaint. But that rule does not apply here because Connelly did not merely attach the agreement, but did so claiming it was fraudulent. Further, Connelly's failure to read the agreement does not preclude justifiable reliance on a misrepresentation by a fiduciary. Finally, we conclude Connelly adequately pleaded fraud, with one exception. For one of his causes of action, he has not adequately pleaded damages, but as to that cause of action we reverse the order denying leave to amend.

2

FACTS[1]

Connelly is a physician and leading expert in the field of human nutrition and metabolism. He is the inventor of the MET-Rx high protein, low-fat vitamin and mineral enriched drink. For more than a decade, Connelly has researched the development of medical products from specific dairy bioactive whey protein fractions to exploit their regenerative properties. In 2001, Connelly identified a specific dairy bioactive fraction, "lactoferrin," and contracted with a research group to produce it. After receiving a suitable sample of the protein fraction, Connelly contracted with Brigham and Women's Hospital in Boston to perform standard rodent testing using lactoferrin. The positive results from that study led Connelly to find a manufacturing partner to commercialize lactoferrin.

That partner turned out to be cross-defendant Murray Gouldburn Co-operative Co. ("Murray Gouldburn"), the largest processor of milk in Australia.[2] Murray Gouldburn perfected industrial methodologies to produce a dairy protein fraction containing lactoferrin, called Whey Growth Factor Extract ("WGFE"). Connelly and Murray Gouldburn formed a joint venture and sold WGFE on a small scale under the brand "Progenex."

A few years later, Connelly and Murray Gouldburn decided to seek additional financing to expand the operation. During the search, Connelly met cross-defendants Adam Stuart Zuckerman and Ryan Page.[3] Zuckerman referred to himself as

---

[1] The following facts taken from Connelly's various cross-complaints are assumed to be true for purposes of this appeal.

[2] Murray Gouldburn is not a party to this appeal.

[3] Zuckerman and Page are not parties to this appeal.

"Adam Stuart" to conceal his identity because Zuckerman had recently been convicted of felony fraud in connection with a business operation.

Zuckerman and Page claimed they could raise the funding Connelly sought through various entities they were affiliated with. After further discussions, Connelly, Zuckerman, and Page agreed to set up a new company to further develop and commercialize products being sold under the Progenex brand name. Zuckerman and Page agreed to raise $5 million, and Connelly agreed to invest $1million to be used exclusively for medical research and to transfer intellectual property rights associated with Progenex to the joint venture.

Subsequently, Connelly, Zuckerman, and Page discussed the importance of speaking to an attorney to form the proposed joint venture and prepare all agreements related to the venture. To that end, Zuckerman and Page introduced Connelly to Joe Hayashi, a partner at the law firm Fortis General Counsel, LLP ("Fortis") as an attorney who could handle the various legal matters they discussed. Over the next few months, on several occasions Page, Zuckerman, and Connelly met with Hayashi to discuss implementation of the deal. Connelly deemed these conversations to be confidential. During these conversations, Hayashi expressly stated he was looking out for Connelly's interests. The parties discussed the assets Connelly would bring to the table together with Connelly's goals and purposes for participating in the deal. Zuckerman and Page were present during these conversations.

Hayashi provided legal advice to Connelly. The legal advice Hayashi provided to Connelly concerned such topics as Connelly's rights in connection with the deal; the formation, ownership, and governance of the new entity; the use and protection of intellectual property and funds invested or to be invested by Connelly; and the rights and obligations between and among Connelly, VenturePharma (a participating company controlled by Zuckerman and Page), and Murray Gouldburn.

4

Hayashi also agreed to perform legal services on Connelly's behalf. For example, Hayashi, at Connelly's request, prepared an agreement ("Contribution Agreement"), which documented, among other things, Connelly's contribution of assets and intellectual property to the new company. Connelly specifically directed Hayashi to clarify in the Contribution Agreement that Connelly was not contributing his "BodyRx" branded products and that Connelly was not responsible for raising money for the new venture. Hayashi agreed to prepare the agreement consistent with Connelly's wishes. Also, Hayashi agreed, at Connelly's request, to prepare the appropriate documentation reflecting that Connelly's $1 million investment would be used principally to fund certain medical studies concerning Progenex (the parties refer to this as the "Investment Agreement").

As a result of these interactions, Connelly believed Hayashi was his attorney.

When Hayashi completed a draft of the Contribution Agreement, he called Connelly to inform him a draft was complete and that it was consistent with Connelly's direction and their various communications. Relying on these representations, Connelly signed the Contribution Agreement and related agreement without reading them.

Hayashi did not inform Connelly additional terms had been added they had not discussed. In particular, Hayashi did not inform Connelly he had added paragraph 3.9, which stated Connelly was "relying solely on [his] legal counsel and not on any statements or representations of the Company's legal counsel, [Fortis], for legal advice with respect to this investment . . . ." Nor did Hayashi inform Connelly about paragraph 8.12, which stated, "Each party to this Agreement acknowledges that [Fortis], outside general counsel to the Company, has in the past performed and is or may now or in the future represent one or more Founders or their affiliates in matters unrelated to the Contribution, including representation of such Founders or their affiliates in matters of a

5

similar nature to the Contribution.[4]  The applicable rules of professional conduct require that [Fortis] inform the parties hereunder of this representation and obtain their consent. [Fortis] has served as outside general counsel to the Company and has negotiated the terms of the Contribution solely on behalf of the Company.  The Company and each Founder hereby (a) acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation; (b) acknowledge that with respect to the Contribution, [Fortis] has represented solely the Company, and not any Founder or any director, officer, member, manager or employee of the Company or any Founder; and (c) gives its informed consent to [Fortis's] representation of the Company in the Contribution."  (Footnote added.)

Hayashi had not discussed conflicts with Connelly as set forth in paragraph 8.12.  Hayashi never asked Connelly if he had independent counsel and knew he did not. Further, contrary to Hayashi's representations, Hayashi had not incorporated language ensuring Connelly's investment would be used principally for medical research.  Finally, Hayashi did not draft the Contribution Agreement to exclude Connelly's "BodyRx" products from the scope of Connelly's contribution.

The Contribution Agreement set forth the various contributions of VenturePharma LLC (a participating entity controlled by Zuckerman and Page), Connelly, and Murray Gouldburn, and documented the equity each investor acquired in Progenex Dairy Bioactive, Inc. (the new entity) as a result of their contributions. Connelly and Murray Gouldburn agreed to transfer or irrevocably license certain intellectual property rights associated with the Progenex product.  VenturePharma provided unspecified "past services."

---

4
      The "Founders" are defined as VenturePharma, Connelly, and Murray Gouldburn.

Throughout the time the Contribution Agreement was being discussed and prepared, which was July through November of 2009, during various meetings and conference calls Hayashi referred to Zuckerman as "Adam Stuart" in furtherance of Zuckerman's effort to conceal his identity. And despite knowing Zuckerman's criminal history, Hayashi never disclosed such facts to Connelly.

Pursuant to the Contribution Agreement, Progenex Dairy Bioactives was obligated to raise $5 million within 90 days. In the event it did not, Connelly and Murray Gouldburn had the right to opt out of the Contribution Agreement (the "reversion right"). The reversion right had to be exercised in writing within 14 days after the 90-day funding period had elapsed.

Progenex Dairy Bioactives did not raise the $5 million. Consequently, Murray Gouldburn exercised its reversion right. Due to the reversion of various intellectual property rights to Murray Gouldburn, this effectively put Progenex Dairy Bioactives out of business.

Progenex Dairy Bioactives began negotiating with Murray Gouldburn in an attempt to bring Murray Gouldburn back into the operation. In the meantime, Progenex Dairy Bioactives, together with Zuckerman, Page, and Hayashi, assured Connelly he did not have to tender his reversion notice while they were still negotiating with Murray Gouldburn. While the negotiations were ongoing, Murray Gouldburn discovered "Adam Stuart" was in fact Adam Stuart Zuckerman, a convicted felon. As a result, Murray Gouldburn broke off the negotiations. At that point, which was well after the contractual time period had expired, Connelly tendered his reversion notice. Despite previously telling Connelly he need not tender his notice while negotiations with Murray Gouldburn were ongoing, Hayashi and the other cross-defendants deemed Connelly's reversion notice late and ineffective.

Thereafter, Progenex Dairy Bioactives, VenturePharma, and a related entity sued Connelly for breaches of various contractual and fiduciary duties. Connelly then

7

filed a cross-complaint naming, among others, Progenex Dairy Bioactives, Murray Gouldburn, VenturePharma, Page, Zuckerman, Hayashi, and Fortis. This appeal concerns only Connelly's cross-complaint against Hayashi and Fortis.

Connelly's initial cross-complaint alleged six causes of action against Hayashi and Fortis: Fraud in the inducement regarding the Contribution Agreement, Fraud in the inducement regarding the Investment Agreement, violation of Corporations Code section 25504.1 (joint and several liability for fraud in the sale of securities)[5] violation of California Code of Regulations, title 10, section 260.504.2.2 (alleging fraud in the preparation of documents in connection with the sale of securities), professional negligence, and fraud regarding Connelly's reversion notice. Connelly did not allege he had an attorney-client relationship with Hayashi or Fortis in the original cross-complaint. Connelly attached the Contribution Agreement as an exhibit to the cross-complaint, but claimed it did not accurately reflect the scope of Hayashi and Fortis's representation.

Hayashi and Fortis demurred, contending, among other things, Connelly had not established the requisite duty to support the causes of action against Hayashi and Fortis because Connelly did not allege an attorney-client relationship.

Rather than respond to the demurrer, Connelly filed a first amended cross-complaint (FACC). This time Connelly did claim an attorney-client relationship, and he detailed various communications he had with Hayashi and services Hayashi provided to Connelly, as described above.[6] Connelly alleged the same causes of action as in the original cross-complaint.

---

[5] All further statutory references are to the Corporations Code unless otherwise indicated.

[6] The second and third amended cross-complaints provide increasingly more detail regarding Connelly's interactions with Hayashi. The differences between the cross-complaints, however, do not play a significant role in the outcome of this appeal.

8

Connelly alleged, essentially, three theories of fraud. We quote extensively from his allegations in the discussion section below. By way of summary, the first theory is that Hayashi falsely represented he was looking out for Connelly's best interests and that the Contribution Agreement was consistent with Connelly's directions. The second theory was that Hayashi fraudulent misrepresented Zuckerman's identity as "Adam Stuart" and concealed Zuckerman's identity and criminal history. The third theory was that Hayashi falsely represented that Connelly did not need to tender his reversion notice while Progenex Dairy Bioactives was negotiating with Murray Gouldburn. Connelly claimed he suffered damages as a result, but did not specify the nature or amount of damages. In connection with his professional negligence claim, which specified some of the same acts, Connelly claimed as damages "the cost of defending the claims alleged against him in this lawsuit and potentially other lawsuits, [and] the costs of prosecuting some or all of the claims alleged by Connelly in this action . . . ."

Hayashi and Fortis demurred, and the court sustained the demurrer as to all causes of action against Hayashi and Fortis with leave to amend. The court ruled the Contribution Agreement, which was attached to the cross-complaint, prevented Connelly from establishing an implied attorney-client relationship: "Inasmuch as the Causes of Action are based on an implied attorney client relationship, the Causes of Action fail as the facts pled do not support the finding of such an implied relationship. The alleged confidential communications cannot support the finding of an implied relationship (*Zenith* [*Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998 (*Zenith*)]). The potential for conflict of interest seems to preclude the finding of an implied relationship [(*ibid*.)]. The prior admissions by Cross-Complainant preclude a finding of such a relationship. The fact that these admissions were contained in an agreement which Cross-Complainant seeks to rescind does not preclude them as admissions. Cross-Complainant himself refers to the terms of the Agreement as assertions of fact; there is no reason that Cross-Defendants cannot do the same especially when the Agreement is still valid until

9

rescinded." The court was apparently referring to paragraphs 3.9 and 8.12 of the Contribution Agreement, quoted above, which indicate Fortis solely represented the new company, not Connelly. The court also found the fraud causes of action were pleaded with insufficient particularity, Connelly had not alleged material assistance with a fraud in connection with the sale of securities as required under section 25504.1, and Connelly had no standing under California Code of Regulations, title 10, section 260.504.2.2.

Connelly filed a second amended cross-complaint (SACC). The SACC continued to rely on an attorney-client relationship between Connelly and Hayashi. Connelly dropped his cause of action based on California Code of Regulations, title 10, section 260.504.2.2, and added a cause of action for breach of fiduciary duty against Hayashi and Fortis. Connelly also filled out his allegation of damages stemming from the fraud to include "all damages resulting from Connelly's execution of purported agreements and documents that do not accurately reflect the terms and conditions of the Progenex Transaction as discussed by Connelly and the Cross-Defendants, including Connelly's investment of $1 million in [Progenex Dairy Bioactives], Connelly's attorneys fees and costs incurred by Connelly as a result of torts committed by others, and Connelly's share of the profits that would have been earned had the Cross-Defendants documented the Progenex Transaction discussed by the parties and not destroyed the parties' relationship be [*sic*] engaging in the conduct alleged above . . . ."

The court sustained another demurrer and this time granted a motion to strike portions of the SACC. As to the causes of action for professional negligence and breach of fiduciary duty, the court sustained without leave to amend on the ground there was no attorney-client relationship, as the court had previously ruled. The court sustained the demurrer without leave to amend as to the violation of section 25504.1 because Connelly had still not alleged facts demonstrating Hayashi and Fortis *materially* assisted in any fraud in connection with the sale of securities. The court sustained the demurrer with leave to amend as to the fraud causes of action, giving Connelly an

10

opportunity to plead fraud outside the context of an attorney-client relationship. The court noted the fraud causes of action "still fail to allege sufficient facts as to duty, justifiable reliance, causation, and damages. . . . It is unclear how Cross Complainant could rely on the Cross Defendants when he has admitted that he was represented by his own legal counsel other than Cross Defendants. Cross Complainant's failure to read the Agreements is to his detriment and not a ground to impose liability on others." Finally, the court struck various allegations concerning the alleged attorney-client relationship.

The third amended cross-complaint (TACC) omitted the professional negligence, breach of fiduciary duty, and section 25504.1 causes of action. It added a negligent misrepresentation claim against Hayashi and Fortis, and accused Hayshi and Fortis of aiding and abetting and conspiring with the other cross-defendants in their fraud.

This time the court sustained a demurrer without leave to amend as to all causes of action against Hayashi and Fortis. "Absent an attorney-client relationship, Connelly has no legal basis for asserting any affirmative duty owed on the part of Hayashi [and] Fortis, so as to support his claims for Fraud in the Second, Third, and Eighteenth Causes of Action and Negligent Misrepresentation in the New Seventh Cause of Action. Further, after having been afforded numerous opportunities to amend, Connelly has not met the heightened pleading standards for Fraud. Further, other than alleging that if he didn't invest, he wouldn't have lost money, Connelly has failed to plead that the actions of Hayashi [and] Fortis caused his damages. And, as stated in earlier rulings, Connelly is unable to plead justifiable reliance on the alleged statements or non-actions of Hayashi [and] Fortis, due to the fact that as the transactional documents clearly spell out, he had access to his own counsel and was never represented by Hayashi [and] Fortis." With respect to the use of "Adam Stuart" to conceal Zuckerman's true name, the court stated, "The Court concurs with Hayashi [and] Fortis that a misrepresentation must involve a positive assertion, in this case, that would be far more than merely referring to a person by the name they are currently using."

11

Connelly timely appealed.[7]

## DISCUSSION

*Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42.) When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Generally, "[i]n reviewing an order sustaining a demurrer without leave to amend, 'the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties.'" (*Heckendorn v. City of San Marino* (1986) 42 Cal.3d 481, 486.)

"Generally it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment." (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636.) In reviewing a

_____

[7] Connelly's notice of appeal purports to be from various orders on the demurrers and motions to strike. The same day Connelly filed his notice of appeal, the trial court filed a judgment of dismissal. We issued an order deeming Connelly's appeal to have been filed immediately after the judgment. We now also deem the appeal to be from the judgment of dismissal, not the nonappealable orders. (*Vitkievicz v. Valverde* (2012) 202 Cal.App.4th 1306, 1310, fn. 2 ("an order sustaining a demurrer without leave to amend is not appealable. [Citation.] In the interests of justice and absent any prejudice to . . . the respondent, we construe the appeal from the order sustaining the demurrer as taken from the order of dismissal later filed").)

12

demurrer "sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid.*)

*Connelly Adequately Pleaded an Implied Attorney-client Relationship*

We turn first to whether Connelly adequately pleaded an attorney-client relationship. The court held, "The alleged confidential communications cannot support the finding of an implied relationship (*Zenith* [,*supra*, 148 Cal.App.4th 998]). The potential for conflict of interest seems to preclude the finding of an implied relationship [(*ibid*.)]." We disagree with the court's interpretation that *Zenith* and conclude Connelly adequately pleaded an implied attorney-client relationship.

"With the exception of a court appointment, the relationship of lawyer and client is created by contract." (*Houston Gen. Ins. Co. v. Superior Court* (1980) 108 Cal.App.3d 958, 964.) "Although the [attorney-client] relationship usually arises from an express contract between the attorney and the client, it may also arise by implication." (*Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441, 444.) "No formal arrangements are necessary to establish an attorney-client relationship [citation], especially where . . . the existence of the relationship is demonstrated and reinforced by the attorney's own conduct." (*Davis v. State Bar* (1983) 33 Cal.3d 231, 237.)

"Whether or not an implied contract has been created is determined by the act and conduct of the parties and all the surrounding circumstances involved . . . ." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 611.) "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts . . . ."

13

(*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141, disapproved on another ground in *Reid v. Google* (2010) 50 Cal.4th 512, 524, 527.)

The following factors are relevant in determining whether an attorney-client relationship has been created by implied agreement: whether the attorney volunteered his or her services to the prospective client; whether confidential information has been disclosed by the prospective client; whether the prospective client reasonably believed he or she was consulting the attorney in the attorney's professional capacity; whether the attorney acted or indicated by statements that he or she was representing the prospective client; the amount of contact between attorney and the prospective client; whether the prospective client sought legal advice from the attorney and whether the attorney provided advice; whether the attorney previously represented the prospective client, particularly where the representation occurred over a period of time or in several matters or without an express agreement; whether the prospective client paid fees or other consideration in the matter in question; and whether the prospective client consulted the attorney in confidence. (Vapnek et al., California Practice Guide: Professional Responsibility (The Rutter Group 2012) ¶ 3:4, p. 3-1; see also State Bar Standing Com. on Prof. Responsibility & Conduct, Formal Opn. No. 2003–161.) Our Supreme Court has emphasized "the factual nature underlying the formation of the professional relation." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 281.)

Here, Connelly alleged sufficient facts to establish an implied attorney-client relationship. Connelly alleged Hayashi expressly said he was looking out for Connelly's interests. (See *Miller v. Metzinger* (1979) 91 Cal.App.3d 31, 39 [where attorney obtained putative client's medical records for evaluation of wrongful death claim and said he "'would take care of it or have somebody take care of it that knew about trying malpractice suits,'" triable issue of fact as to existence of attorney-client relationship precluded summary judgment]; see also *Tormo v. Yormark* (D.N.J. 1975) 398 F.Supp. 1159 , 1166 [cited by *Miller*, attorney's promise "'to see what could be done

14

with regard to settlement'" sufficed to imply an attorney-client relationship].) Connelly alleges Hayashi rendered legal advice to Connelly on various topics concerning the transaction, which prima facie establishes an attorney-client relationship. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1148 ["'"When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." [Citation.]'"].) Connelly alleged Hayashi performed legal services for Connelly — i.e., drafted various agreements at Connelly's request — and that Connelly had several confidential conversations with Hayashi. Both of these are factors listed above as tending to show an attorney-client relationship. Based on these interactions, Connelly alleged he believed Hayashi was acting as his attorney. Taken at face value, these allegations touch on several of the factors listed above and thus suffice to plead an implied attorney-client relationship.

In concluding Connelly had not sufficiently alleged an implied attorney-client relationship, the court relied exclusively on *Zenith*, *supra*, 148 Cal.App.4th 998. But as noted, we disagree with the court's interpretation of *Zenith*.

In *Zenith*, Zenith Insurance Company agreed to reinsure Royal Insurance Company for all of Royal's exposure under certain insurance policies between Royal and its insured. The reinsurance agreement provided Royal the right to defend and settle, in its sole discretion, claims on the underlying policies, and denied Zenith any right to associate in the defense or settlement of the claims. (*Zenith*, *supra*, 148 Cal.App.4th at pp. 1002-1003.) After claims were asserted against Royal's insured, Royal retained the respondent law firm to defend the claims. Royal settled the claims and demanded payment from Zenith. (*Id.* at p. 1003.) Zenith sued the law firm for professional negligence, claiming it had mishandled the settlement by failing to pursue certain contribution and indemnification claims. (*Ibid.*) Zenith admitted there was no express attorney-client relationship, but claimed one was implied based on the circumstances, or, alternatively, that Zenith was an intended beneficiary of the contract between Royal and

15

the attorney. (*Id.* at pp. 1004-1005.) In support of its claims, Zenith alleged the attorney occasionally spoke with Zenith concerning the pending litigation and settlement strategy. (*Id.* at p. 1004.) On another occasion one of Royal's representatives assured Zenith the law firm was "'protecting all of our interests,'" though neither the attorney nor the law firm was party to that statement. (*Ibid.*) Further, the attorney knew Zenith was liable for both the settlement costs and attorney fees. (*Id.* at p. 1005.) Finally, the attorney never told Zenith he was *not* representing them. (*Ibid.*)

The trial court sustained a demurrer, finding the law firm had no duty to Zenith, and the Court of Appeal affirmed. It held the contractual relationship between Zenith and Royal precluded an implied attorney-client relationship between Zenith and the attorney: "[T]he context of this case is a commercial arrangement between a ceding insurer and a reinsurer. The reinsurer had no contractual or legal obligations to Royal's insured. It had no involvement in Royal's selection of [the attorney] or its direction of [the attorney], nor any right to participate in the settlement, adjustment or defense of any claims, even though it would ultimately be responsible for paying them. Zenith, as reinsurer, had the right to claims files, legal opinions and access to Royal's agents. Thus, allegations describing the contacts and communications necessary to ensure that Zenith received that information could not establish an undertaking by [the attorney] to represent Zenith." (*Zenith*, *supra*, 148 Cal.App.4th at p. 1011.) The court further noted that at one point Zenith directed the attorney to file claims against potential indemnitors, but the attorney refused, which militated against any implied attorney-client relationship. (*Ibid.*)

The *Zenith* court also held Zenith was not a third-party beneficiary of the contract between Royal and the attorney. The court noted, importantly, that in this portion of the argument, "Zenith does *not* rely on any claim of a direct express or implied contractual relationship." (*Zenith*, *supra*, 148 Cal.App.4th at p. 1008.) Rather, "[a]n essential predicate for establishing an attorney's duty of care under an 'intended beneficiary' theory is that *both* the attorney . . . and the client, Royal, must have intended

16

Zenith to be a beneficiary of legal services [the attorney] was to render. [Citation.] Even if the lawyer's representation could *incidentally* benefit the claimant, that does not sufficiently satisfy this predicate." (*Ibid.*) The court noted that the potentially adverse interests of Royal and Zenith precluded any inference that Royal *intended* the attorney-client relationship to benefit Zenith: "Royal, but not Zenith, would be exposed to potential bad faith liability for the unjustified failure to fully discharge all of the obligations owed under the policy. Thus, [the attorney] could not ethically represent both Royal and Zenith in these matters. In such circumstance, it would be impossible to conclude that either Royal or [the attorney] ever *intended* to confer upon Zenith beneficiary status of [the attorney's] legal services performed for Royal." (*Id.* at p. 1008.) "The existence of such a conflict of interest precludes implication of third-party beneficiary status." (*Id.* at p. 1009.)

Here, the court drew two conclusions from its reading of *Zenith*, neither of which withstands analysis. First, citing *Zenith*, the court held, "The alleged confidential communications cannot support the finding of an implied relationship." Second, "The potential for conflict of interest seems to preclude the finding of an implied relationship." *Zenith* does not stand for either of those propositions.

With respect to confidential communications, *Zenith* held the fact of those communications did not establish an implied attorney-client relationship in the unique circumstances of that case because the reinsurer was statutorily entitled, under Insurance Code section 622, to receive such communications, even absent an attorney-client relationship. (*Zenith*, *supra*, 148 Cal.App.4th at p. 1011.) The attorney "was doing no more than discharging on Royal's behalf that statutory obligation. The *fact* of such communication can neither destroy an applicable privilege . . . nor *create* an attorney-client relationship." (*Id.* at p. 1010.) There is no similar circumstance here. Rather, as noted above, the presence of confidential communications is one factor tending to establish an implied attorney-client relationship.

17

Nor does a conflict of interest preclude an implied attorney-client relationship. *Zenith* simply held the conflicting interests of Royal and Zenith were evidence that neither the attorney nor Royal *intended* Zenith to be the beneficiary of the attorney's legal services. Moreover, that point was raised in connection Zenith's argument that it was an intended third-party beneficiary of the lawyer's services rendered under his contract with Royal, not that the presence of a conflict precluded an implied attorney-client relationship. The presence of a conflict may be relevant in determining whether an implied attorney-client relationship arose in the totality of the circumstances, but *Zenith* does not stand for the proposition that such a conflict is dispositive.

Such a rule, moreover, would only pervert the law. The reality is attorneys do occasionally improperly represent conflicted clients. It would be unjust to permit such an attorney to automatically escape liability for professional negligence or breach of fiduciary duty *because* of the conflict. But, assuming Connelly's allegations are true, that is essentially what happened here: Hayashi represented conflicted clients and, under the court's ruling, escaped liability because the conflict precluded any allegation that Hayashi represented Connelly. The court erred.

Hayashi and Fortis offer an additional argument for why no attorney-client relationship could form: because Zuckerman and Page were present at the various conversations Connelly had with Hayashi, and thus the communications were not confidential. We reject this argument for two reasons.

First, the existence of confidential communications is only one factor in determining whether an attorney-client relationship formed. Even if Hayashi and Fortis were right, therefore, Connelly pleaded other facts tending to show an attorney-client relationship, which are sufficient for purposes of pleading.

Second, Hayashi and Fortis's position is incorrect because the presence of Zuckerman and Page is consistent with an implied joint representation. *Hecht v. Superior Court* (1987) 192 Cal.App.3d 560, is instructive. In *Hecht* two individuals contacted an

18

attorney to help form a new corporation. (*Id.* at pp. 563-564.) During the formation stages of the corporation, the two individuals and the attorney had one meeting and several phone conferences to discuss various corporate matters, such as selecting officers, directors, and shareholders. (*Ibid.*) Once the corporation was formed, both individuals were listed as officers and shareholders. (*Ibid.*) The individuals later had a falling out and one of them, the defendant, excluded the other, the plaintiff, from the corporation. (*Ibid.*) The plaintiff sued for her share of the profits and sought to depose the attorney. (*Ibid.*) Defendant objected on the basis of the attorney-client privilege and the trial court agreed in part. (*Ibid.*) The Court of Appeal reversed, holding the above facts sufficed to invoke the "'joint client'" exception to the attorney-client privilege. (*Id.* at p. 567.)

Here, Connelly alleged significantly more interaction between himself and Hayashi than was the case in *Hecht*. Just as in *Hecht*, we conclude Connelly's communications, despite the presence of Zuckerman and Page, are consistent with an implied joint representation.[8]

*The Contribution Agreement Did Not Preclude Connelly from Pleading an Implied Attorney-Client Relationship*

The court further found certain "admissions" in the Contribution Agreement, which was attached to Connelly's cross-complaint, precluded Connelly from pleading an attorney-client relationship with Hayashi. Specifically, paragraph 3.9 states Connelly was "relying solely on [his] legal counsel and not on any statements or representations of the Company's legal counsel, [Fortis], for legal advice with respect to

---

[8] Hayshi and Fortis cite out-of-state authority for the proposition that an attorney retained to form a legal entity represents the entity even before it actually exists. They conclude they represented the as-yet-unformed entity, not Connelly. We need not decide whether California would indulge nonexistent clients, however, because here the allegations establish an attorney-client relationship with Connelly regardless of who else Hayashi and Fortis represented.

19

this investment . . . ." And paragraph 8.12 states, "[Fortis] has served as outside general counsel to the Company and has negotiated the terms of the Contribution solely on behalf of the Company. The Company and each Founder hereby . . . acknowledge that with respect to the Contribution, [Fortis] has represented solely the Company, and not any Founder or any director, officer, member, manager or employee of the Company or any Founder . . . ."

We hold these contractual provisions did not preclude Connelly from pleading an implied attorney-client relationship.

Generally, "[w]e . . . 'accept as true both facts alleged in the text of the complaint and facts appearing in exhibits attached to it. If the facts appearing in the attached exhibit contradict those expressly pleaded, those in the exhibit are given precedence.'" (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 245 (*Sarale*).) The basis for this rule is the "truthful pleading" requirement. Under the truthful pleading requirement, ""The pleadings must be true. That is to say, the pleader must set forth his case as he believes it . . . the rule is universal and inexorable, that nothing whatever should be alleged which is not believed to be true; and the lawyer who inserts any statement, no matter how trivial, which he does not believe, violates that rule, and with it, his duty as an officer of the law.'" [O]ne of the several applications of the principle of truthful pleading is that '[f]alse allegations of fact, inconsistent with annexed documentary exhibits [citation] or contrary to facts judicially noticed [citation], may be disregarded, and factual contradictions within a verified complaint may result in admissions [citation].'" (*Williams v. Southern California Gas Co.* (2009) 176 Cal.App.4th 591, 598.)

Consistent with the purpose of ensuring truthfulness, the rule prioritizing facts in attached exhibits is applied where the allegations in the complaint are inconsistent with facts apparent in attached exhibits. (See, e.g., *Sarale*, *supra*, 189 Cal.App.4th at p. 245 [plaintiffs claimed gas company had no easement over their land

20

but attached to their complaint a grant of right-of-way conclusively demonstrating such an easement; plaintiffs did not challenge the validity or accuracy of the exhibit]; *Holland v. Morse Diesel Intern., Inc.* (2001) 86 Cal.App.4th 1443, 1448-1449 [contract attached to complaint demonstrated plaintiff was an unlicensed subcontractor, not merely a provider of labor and supplies; plaintiff did not dispute the validity of the contract, only its characterization]; *Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627 [plaintiff claimed he was a customer of a bank but attached bank documents demonstrating the account in fact belonged to a separate company; plaintiff did not dispute the validity of the bank documents].)

Here, however, there is an obvious point of distinction: Connelly claims the attached agreement was procured by fraud. Where a party claims fraud in the execution and attaches the fraudulent agreement as an exhibit to a complaint, it makes little sense to bind the plaintiff to the fraudulent agreement simply because it was attached. And that is essentially what Connelly alleges. Connelly alleges he never read the agreement, the agreement was materially different than what he thought, the disclaimer of an attorney-client relationship was false, and his signature was procured by fraud. There is no indication on the face of the complaint *Connelly* is being untruthful. It is entirely possible the author of the Contribution Agreement was being untruthful, as Connelly alleges. Because we cannot conclude Connelly was being untruthful, there is no basis for holding Connelly to recitals in the Contribution Agreement. In holding otherwise, the court erred. [9]

---

[9]       The parties extensively briefed whether the "sham pleading doctrine" precluded Connelly from alleging an attorney-client relationship based on allegedly inconsistent allegations in the original cross-complaint. It does not appear to us, however, that the trial court ruled on the basis of the "sham pleading doctrine." The trial court's ruling on the demurrer to the FACC states, "The prior admissions by Cross-Complainant preclude a finding of [an attorney-client] relationship. The fact that these admissions *were contained in an agreement* which Cross-Complainant seeks to rescind does not preclude them as admissions." (Italics added.) As the italicized portion makes

21

The court dismissed Connelly's causes of action for professional negligence and breach of fiduciary duty solely based on the absence of an attorney-client relationship. The court's ruling as to those causes of action is reversed.

*Connelly Adequately Pleaded Fraud*

The court sustained a demurrer to Connelly's fraud claims. We review the court's ruling de novo. (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439-440.)

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).) "'Fraud actions . . . are subject to strict requirements of particularity in pleading. [A]llegations of fraud involve a serious attack on character, and fairness to the defendant demands that he should receive the fullest possible details of the charge in order to prepare his defense. Accordingly the rule is everywhere followed that fraud must be specifically pleaded. [T]he policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.'" (*Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216 (*CCTV, Inc.*), superseded by statute on other grounds as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228.) "'This particularity

clear, the trial court was relying on admissions contained in the Contribution Agreement, not separate admissions in the text of the cross-complaint. Also, the court nowhere mentioned the "sham pleading doctrine" or anything like it. Application of the "sham pleading doctrine" is reviewed for abuse of discretion. (*Sanai v. Saltz* (2009) 170 Cal.App.4th 746, 768.) Since the trial court never exercised its discretion on this issue, the issue is not properly before us.

requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."'" (*Lazar*, *supra*, 12 Cal.4th at p. 645.)

The court found Connelly's fraud causes of action to be deficient in several respects: (1) Connelly had not adequately pleaded when, where, to whom, and by what means the alleged misrepresentations were made; (2) Connelly had not pleaded a duty to disclose facts that were allegedly concealed; (3) Connelly could not establish justifiable reliance; and (4) Connelly did not plead causation and damages. Below we analyze each finding and conclude Connelly adequately pleaded fraud, with one exception, and as to that exception Connelly must be given an opportunity to amend.

We begin with the alleged misrepresentations. Connelly's first fraud cause of action is entitled, "Fraud in the Execution Re: Contribution Agreement." Connelly alleged, "[B]eginning in July 2009 and continuing through November 2009 Connelly and cross-defendant Hayashi participated in meetings and conference calls regarding various aspects of the Progenex Transaction." "Hayashi represented to Connelly that Hayashi was looking out for Connelly's interests and that the Contribution Agreement would be consistent with the various issues Hayashi and Connelly discussed throughout their confidential communications." In particular, "Connelly directed Hayashi to include provisions making clear that (a) Connelly's contribution to [Progenex Dairy Bioactive] did not include BodyRx; and (b) Connelly was not responsible for raising money for [Progenex Dairy Bioactive]." "Just before November 8, 2009, Hayashi told Connelly by telephone that consistent with Connelly's direction and their communications, Hayashi had prepared and finalized a Contribution Agreement and all related agreements." "These representations made by said Hayashi were, in fact, false." "In addition, during these meetings, conference calls and in e-mail communications involving Hayashi and Connelly, Hayashi referred to Zuckerman as 'Adam Stuart.' The purpose of this was in furtherance of the efforts of Defendants to conceal Zuckerman's criminal history from Connelly to induce Connelly to enter into the Contribution Agreement . . . ."

23

In determining whether these allegations sufficiently set forth the alleged misrepresentation, we bear in mind the purpose of the specificity requirement. "The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.'" (*CCTV, Inc., supra*, 35 Cal.3d at pp. 216-217.) The second is "'"to enable the court to determine whether, on the facts pleaded, there is any foundation, *prima facie at least*, for the charge of fraud."'" (*Ibid.*, italics added.)

With these purposes in mind, Connelly's fraud allegations pass muster because he alleges the when, where, to whom, and by what means requirements. When: between July 2009 and November 2009. Where: in meetings and conference calls. To whom: Connelly. By what means: orally. These allegations are sufficient to satisfy the purposes of the specificity requirement—putting defendants on notice and permitting a court to prima facie analyze their sufficiency. (See *CCTV, Inc., supra*, 35 Cal.3d at pp. 217-218 [holding fraud allegations concerning "all ads for sugared cereals within a given four-year period" was "sufficient to define the subject of the complaint and provide notice to defendants"]; *Wald v. Truspeed Motorcars, LLC* (2010) 184 Cal.App.4th 378, 394 [holding allegations of "[o]ral statements made at a meeting" in "June 2008" at company offices alleged fraud with sufficient particularity]; see also *Murphy v. BDO Seidman* (2003) 113 Cal.App.4th 687, 693 ["The complaint thus provides enough information for respondents to know what purported falsehoods they must defend against"].) We might prefer to have greater detail regarding precisely when each meeting and conference call occurred, and where the meetings took place, but we are mindful there has been no discovery on that topic, and the plaintiff is an individual who may only have memory to rely on. The facts alleged here are sufficiently particular to permit Hayashi and Fortis to focus their own inquiry and discovery efforts moving forward.

We reach a similar result with respect to Connelly's remaining two fraud causes of action. In the cause of action entitled, "Fraud in the Inducement Re:

24

Investment Agreement," Connelly alleges, "During several phone calls and/or meetings in or about August and September 2009 and in late October 2009, Hayashi represented to Connelly that he would prepare the appropriate paperwork documenting the fact that funds contributed by Connelly would be used solely for the purposes of paying for the cost of medical studies coordinated by Connelly . . . . [¶] The true facts were that Hayashi had no intention of preparing the appropriate paperwork documenting the fact that funds contributed by Connelly would be used solely for the purposes of paying for the cost of medical studies . . . ." When: August and September 2009 and late October 2009. Where: phone calls and meetings. To whom: Connelly. By what means: oral statements.

Similarly, in the cause of action entitled, "Fraud Re: Connelly Reversion Notice, Connelly alleges, "[B]eginning in or about late January 2010 to the first week of February 2010, . . . Hayashi and Fortis orally represented to Connelly during phone conferences that he was not required to send a 'reversion notice' opting out of the Contribution Agreement . . . while negotiations to review the terms of the Contribution Agreement were pending between [Progenex Dairy Bioactive] and [Murray Gouldburn]. [¶] [T]hese representations . . . were, in fact, false." When: late January to early February 2010. Where: phone conferences. To whom: Connelly. By what means: oral statements. These allegations are sufficient.

Next we turn to whether Connelly adequately pleaded a duty to disclose various facts he claims were concealed.

"'"[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a

25

result of the concealment or suppression of the fact, the plaintiff must have sustained damage."'" (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.)

Connelly claims, essentially, Hayashi had a duty to disclose the unfavorable terms of the Contribution Agreement that were inconsistent with Connelly's prior direction, and Hayashi had a duty to disclose Zuckerman's criminal history.  The court sustained the demurrers, finding Connelly had not pleaded facts demonstrating Hayashi had a duty to disclose these facts.

In reaching that conclusion, the court relied on its erroneous conclusion that Connelly had not adequately pleaded an attorney-client relationship between Connelly and Hayashi.  We have concluded otherwise, and consequently must reject the court's finding regarding duty as well.

"[T]he dealings between practitioner and client frame a fiduciary relationship.  The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. 'Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud. . . .'" (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 188-89, fn. omitted.)  Assuming Hayashi was Connelly's attorney, the fact that the Contribution Agreement did not contain provisions Connelly had discussed with Hayashi was unquestionably a material fact Hayashi had a duty to disclose.  Similarly, that the Contribution Agreement disclaimed an attorney-client relationship was a material term Hayashi had to disclose.  Likewise, the fact that Hayashi was arranging a business relationship between Connelly and a convicted felon was a fact Hayashi had a duty to disclose.  (See *AREI II Cases* (2013) 216 Cal.App.4th 1004, 1022-1023 [plaintiff adequately alleged fraud against investment bankers that aided in concealment of the criminal background of the owner of one party to a business transaction].)  And assuming Hayashi concealed these facts with fraudulent intent, as Connelly alleges, Hayashi committed fraud.

26

We turn next to the court's holding that Connelly could not have justifiably relied on Hayashi's misrepresentations and concealments regarding the content of the Contribution Agreement because Connelly admits he did not read it. In so holding, the court erred.

"[U]pon a clear showing that a written instrument was executed by one party to it without reading it in the belief, induced by the fraudulent representations of the other party, that its provisions were different from those set out, the courts should set the agreement aside. Certainly it would be a reproach to our law if an attorney . . . could thus deliberately misrepresent the terms of a writing and hold the client to a bargain which he never intended to make. [W]e cannot close our eyes to the fact that as a practical matter many people would sign such a contract without reading it, when prepared by an attorney, because of the fact that the drawing of contracts is a matter which the average person, and very rightly, feels is peculiarly a lawyer's business. [¶] [I]t is the unquestioned rule that where the parties occupy a relation to one another which the law regards as confidential a written contract which one of the parties induces the other to sign by knowingly misrepresenting its contents may be set aside." (*Mazuran v. Stefanich* (1928) 95 Cal.App. 327, 331-332; see also *Simmons v. Ratterree Land Co.* (1932) 217 Cal. 201, 205 ["Although a purchaser may not offer as a defense against the provisions of a contract that he failed to read it, if his failure to read is due to fraud or trickery of the seller or his agent, the rule is otherwise"]; *Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4th 938, 959 ["If the defendant is in a fiduciary relationship with the plaintiff which requires the defendant to explain the terms of a contract between them, the plaintiff's failure to read the contract would be reasonable. [Citations.] In such a situation, the defendant fiduciary's failure to perform its duty would constitute constructive fraud [citation], the plaintiff's failure to read the contract would be justifiable [citation], and constructive fraud in the execution would be established"].) As Professor Williston eloquently stated, "[I]f a party has fraudulently misrepresented a

27

document's contents or induced the other party to refrain from reading the document, courts will allow a remedy, choosing not to permit a positively fraudulent party to prosper because of the stupidity or credulity of the defrauded party, subject only to the rights of innocent third parties.  In short, the law should not give any assistance to a knave, a scoundrel or a con artist who preys upon the less alert or more naive members of society."  (27 Williston on Contracts (4th ed. 2012) § 69:35, pp. 37-39, fns. omitted.)

Here, as we concluded above, Connelly adequately pleaded an attorney-client relationship with Hayashi.  Accordingly, Connelly's failure to read the Contribution Agreement does not preclude justifiable reliance on Hayashi's representations concerning the nature of the agreement.

Finally, we turn to the court's conclusion that Connelly did not plead causation and damages.  Connelly alleged, in essence, three theories of fraud, though the three theories are mixed throughout the counts in Connelly's complaint.  First, Hayashi defrauded Connelly by not informing, or misinforming, Connelly about Zuckerman's prior criminal history, including a recent criminal conviction for fraud.  Second, Hayashi defrauded Connelly by misrepresenting or concealing the true nature of the Contribution Agreement.  Third, Hayashi defrauded Connelly by falsely stating Connelly did not have to serve a timely reversion notice.  The court held, "There are no facts alleged as to how any representation by Cross Defendants were the actual and proximate cause of Cross Complainant losing his $1 million investment."  "[O]ther than alleging that if he didn't invest, he wouldn't have lost money, Connelly has failed to plead that the actions of Hayashi Fortis caused his damages."

With respect to the first theory of fraud, we agree with the court.  The gist of Connelly's theory is that Hayashi defrauded Connelly into doing business with a fraudster, Zuckerman, and the fraudster, predictably, defrauded Connelly.  As a general matter, this theory is viable in terms of causation.  The problem is, Connelly did not allege he lost money.  He claims he made an investment of $1 million and contributed

28

valuable intellectual property rights. But he received equity in Progenex Dairy Bioactive in exchange, and he did not allege his equity has lost value. For all we know, his $1 million investment could have turned into $100 million (certain allegations hint otherwise, but in the context of a fraud cause of action, more than hints is required).[10]

Nonetheless, Connelly should be given an opportunity to amend. We acknowledge the court already gave Connelly two opportunities to amend. But the court's comments on the issue of causation and damages were cursory, offering Connelly little guidance on what the defect was, much less how to cure it. And, of course, Connelly is hearing from us for the first time. (See *CCTV, Inc.*, *supra*, 35 Cal.3d at p. 221 ["We recognize that plaintiffs have already had opportunities to amend, but without the guidance of this opinion, their failure to make the specific amendments we now require is excusable"].) Under the circumstances, Connelly's failure to properly cure the causation and damages issue is excusable, and the court's refusal to grant leave to amend an abuse of discretion. On remand, Connelly should be given an opportunity to allege facts — if he can do so truthfully — demonstrating not just that he made an investment he otherwise would not have made, but that his investment resulted in a loss.

With respect to Connelly's other two theories of fraud, he has adequately alleged causation and damages. Critically, both the court and Hayashi and Fortis ignored certain of Connelly's damages allegations. Connelly claimed as damages from Hayashi's fraud, "Connelly's attorneys fees and costs incurred by Connelly as a result of torts committed by others . . . ." And Connelly claimed as damages from Hayashi's professional negligence, which encompassed many of the same acts as the fraud cause of action, "the cost of defending the claims alleged against him in this lawsuit and . . . the costs of prosecuting some or all of the claims alleged by Connelly in this action . . . ."

_____

[10] Notably, Connelly does not seek rescission or restitution against Hayashi and Fortis, presumably because they were not parties to the Contribution Agreement. He seeks damages.

Connelly has properly alleged damages under the tort-of-another doctrine. "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [defendant escrow company negligently closed escrow in sale of real estate, and as a result plaintiff had to sue third parties to quiet title. Court held plaintiff could recover attorney fees and costs incurred in the quiet title action from the escrow company in a negligence suit].) "In the usual case, the attorney's fees will have been incurred in connection with a prior action; but there is no reason why recovery of such fees should be denied simply because the two causes (the one against the third person and the one against the party whose breach of duty made it necessary for the plaintiff to sue the third person) are tried in the same court at the same time." (*Id.* at p. 621.) Here, Connelly has had to defend against the complaint in this action and has cross-complained against various other individuals and entities. He claims these suits would have been unnecessary had the Contribution Agreement accurately reflected his conversations with Hayashi, and he also claims none of these suits would have been necessary had he not been fraudulently induced to delay service of his reversion notice. Thus both theories of fraud have a causal link to his tort-of-another damages.

With the exception noted above, Connelly adequately pleaded each of the elements of fraud. Thus the court erred in sustaining demurrers to the fraud causes of action.

*The Court Erred in Sustaining the Demurrer to the Corporations Code section 25504.1 Cause of Action*

We also conclude the court erred in sustaining a demurrer to Connelly's cause of action under section 25504.1. Section 25504.1 states, "Any person who

30

materially assists in any violation of Section . . . 25401 . . . , with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter for such violation." Section 25401 states, "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." "In order to have a valid cause of action under California Corporations Code § 25401 [a plaintiff] must allege that there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading." (*MTC Electronic Technologies Co., Ltd. v. Leung* (C.D. Cal. 1995) 876 F.Supp. 1143, 1147.) "To support liability under section 25504.1 for such a violation, the complaint must include allegations demonstrating how the defendant assisted in the act of selling or offering to sell securities by means of false and misleading statements. Such assistance may take the form of aiding in the preparation of offering documents relied upon by investors, communicating misrepresentations directly to investors . . . ." (*AREI II Cases*, *supra*, 216 Cal.App.4th at p. 1015.) Further, the defendant must not merely have assisted in the sale of the securities, but must have assisted in the violation itself. (*Id.* at pp. 1015-1016.)

Connelly pleaded a violation of section 25401 against cross-defendants Progenex Dairy Bioactives, Page, and Zuckerman, which forms the predicate for his section 25504.1 claim against Hayashi and Fortis. The gist of those claims is that cross-defendants falsely represented their ability to raise funds for the operation and falsely represented the scope of Connelly's obligations under the relevant agreements. Hayashi and Fortis do not contend in their brief that Connelly inadequately pleaded a violation of section 25401. And the court, for its part, held only that Connelly had not pleaded *material* assistance by Hayashi and Fortis under section 25504.1. Thus we assume,

31

without deciding, that Connelly adequately pleaded a violation of section 25401 against the other cross-defendants.

We have no trouble concluding Connelly pleaded material assistance by Hayashi and Fortis. Hayashi allegedly formed the corporation and drafted the relevant documents leading to the sale of the Progenex Dairy Bioactive stock. He then allegedly obtained Connelly's signature by fraud. He also allegedly concealed the fraudulent character and criminal history of Zuckerman, who Connelly claims committed the predicate violation of section 25401. These alleged acts were plainly material contributions to the alleged violations of section 25401. In holding otherwise, the court erred.

*The Court Erred in Striking Connelly's Negligent Misrepresentation, Conspiracy to Defraud, and Aiding and Abetting Counts*

In sustaining the demurrer to the SACC, the court granted Connelly leave to amend his fraud counts to omit any reliance on an attorney-client relationship. In doing so, Connelly added counts — based on exactly the same facts — of negligent misrepresentation, conspiracy to defraud, and aiding and abetting in fraud. The court apparently struck these counts, stating, "To the extent that the Motion to Strike is not Moot, as it addresses Causes of Action included in the TAC[C], for which leave to amend was not granted, the Court Grants the Motion without leave to amend."[11] The court erred.

"Following an order sustaining a demurrer or a motion for judgment on the pleadings with leave to amend, the plaintiff may amend his or her complaint only as authorized by the court's order." (*Harris v. Wachovia Mortgage, FSB* (2010) 185 Cal.App.4th 1018, 1023.) "This rule is inapplicable," however, where "the new cause of

_____

[11] We say "apparently" because the trial court did not specify precisely what it was striking.

32

action directly responds to the court's reason for sustaining the earlier demurrer." (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1015.)

Connelly's new legal theories directly responded to the court's reasoning for sustaining the demurrer to the SACC. The court gave Connelly leave to amend precisely so he could change his theory of fraud against Hayashi to omit any reference to an attorney-client relationship. It comes as no surprise that this would entail pleading different legal theories on the same facts. Thus, the court erred in striking the counts of negligent misrepresentation, conspiracy, and aiding and abetting.

DISPOSITION

The judgment of the trial court is reversed. Upon remand, and within 30 days following issuance the remittitur, Connelly may file a fourth amended cross-complaint, making allegations held sufficient by this opinion. Connelly shall recover his costs incurred on appeal. [12]

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

BEDSWORTH, J.

---

[12] Connelly claims the trial court erred in limiting certain discovery that was permitted prior to his filing of the TACC. The purpose of the discovery was to better enable Connelly to plead his causes of action. Our disposition renders the pre-complaint discovery issue moot.